IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

STEPHEN D. WESBROOK, Ph.D.
2329 North Glebe Road
Arlington, VA 22207

        Plaintiff,

        v.                        Case No.:  13-cv-494

KARL J. ULRICH, M.D.
9920 Los Lagos Circle
Granite Bay, CA 95746

EDWARD A. BELONGIA, M.D.
11728 Falcon Road
Marshfield, WI 54449

BARBARA C. LEE, Ph.D.
1806 Arlington Street
Marshfield, WI 54449

RONALD F. MARTIN, M.D.
1511 Luther Court
Marshfield, WI 54449

        Defendants.

---

## AMENDED COMPLAINT

---

Plaintiff, Stephen D. Wesbrook, Ph.D., by his attorneys, Cullen Weston Pines &

Bach LLP, alleges as follows:

## NATURE OF THE ACTION

1.      This is a civil action for tortious interference by the Defendants Karl J.

Ulrich, M.D., Edward A. Belongia, M.D., Barbara C. Lee, Ph.D., and Ronald F. Martin,

M.D. with Plaintiff Stephen D. Wesbrook's employment by the Marshfield Clinic.

## JURISDICTION

2.      Complete diversity of citizenship exists as to the parties and the amount in

controversy, excluding interest and costs, exceeds the jurisdictional threshold of

$75,000.  This court thus has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1332.

## VENUE

3.      Venue in this judicial district is appropriate pursuant to 28 U.S.C. § 1391

because a substantial part of the acts and omissions upon which this action is based

occurred within the Western District of Wisconsin.

## PARTIES

4.      Plaintiff Stephen D. Wesbrook, Ph.D. ("Wesbrook"), is an adult resident of

the state of Virginia who resides at 2329 North Glebe Road, Arlington, Virginia 22207.

Beginning on November 27, 2006 and at all times thereafter material to this complaint,

Wesbrook was an employee of Marshfield Clinic ("the Clinic") and the Marshfield

Clinic Research Foundation ("Research Foundation").

5.      Defendant Karl J. Ulrich, M.D. ("Ulrich") is an adult resident of the State

of California who resides at 9920 Los Lagos Circle, Granite Bay, California 95746.  At all

times material to this complaint, Ulrich was a physician, Shareholder of the Clinic,

2

Member of the Board of Directors of the Clinic, and President and CEO of the Clinic. Ulrich's tenure as President and CEO ended on January 31, 2012.  On December 22, 2011, he submitted his resignation as a physician and Shareholder of the Clinic effective in February 2012.

6.     Defendant Edward A. Belongia, M.D. ("Belongia") is an adult resident of the State of Wisconsin who resides at 11728 Falcon Road, Marshfield, Wisconsin 54449. At all times material to this complaint, Belongia was a physician-scientist working at the Research Foundation and a Shareholder of the Clinic.

7.     Defendant Barbara C. Lee, Ph.D. ("Lee") is an adult resident of the State of Wisconsin who resides at 1806 Arlington Street, Marshfield, Wisconsin 54449.  At all times material to this complaint, Lee was a scientist working at the Research Foundation and an employee of the Clinic.

8.     Defendant Ronald F. Martin, M.D. ("Martin") is an adult resident of the State of Wisconsin who resides at 1511 Luther Court, Marshfield, Wisconsin 54449.  He was at all times material to this complaint a physician, Shareholder of the Clinic, and Member of the Board of Directors of the Clinic.  In 2011, Martin became Chairman of the newly created Marshfield Clinic Audit and Compliance Committee, an appointment he still holds.  Martin remains a member of the Clinic Board of Directors.

## FACTS

## MARSHFIELD CLINIC, MARSHFIELD CLINIC RESEARCH FOUNDATION, AND WESBROOK'S BACKGROUND AND ROLE

9.     At all times material to this complaint, the Clinic was a stock corporation organized under the laws of the State of Wisconsin and recognized as a non-profit, tax exempt charitable organization under Section 501(c)(3) of the Internal Revenue Code. Its principal place of business is 1000 North Oak Avenue, Marshfield, Wisconsin 54449. The Clinic, now known as Marshfield Clinic Health System, Inc., has since changed its governance structure and selected a new Board of Directors that includes a majority of independent members.

10.     The Marshfield Clinic Research Foundation is governed by a Board of Trustees which is comprised of 10 public members and 10 elected physicians and scientists employed by Marshfield Clinic.  Among the Trustees' responsibilities are oversight and administration of financial and other resources, policy direction for research activities, and advising the Clinic Board of Directors.  The Trustees have a fiduciary responsibility for the research endowments and other funds donated for research.

11.     At all times material to this complaint, Wesbrook was employed at Marshfield Clinic as Deputy Director of the Marshfield Clinic Research Foundation.

12.     A 1970 graduate of the United States Military Academy at West Point, Wesbrook had a distinguished career of public service before joining Marshfield Clinic serving as an officer in the United States Army for 28 years, leaving active duty as a

4

Colonel.  In addition to his wartime awards earned while leading infantry soldiers in the Vietnam War and Gulf War, which included the Combat Infantryman's Badge, Bronze Star, and Legion of Merit, he was awarded the Army's highest decoration for peacetime service, the Distinguished Service Medal.

13.     As Deputy Director, Wesbrook had the duty of assisting the Director of the Research Foundation in the full range of his responsibilities for Marshfield Clinic's nationally recognized medical research program and of assisting the Director in his capacity as a member of the Clinic's Board of Directors.

14.     Wesbrook held multiple positions of trust and responsibility within the Clinic in addition to being Deputy Director of the Research Foundation.  He was a member of the Clinic's highest non-physician advisory body, the Administrative Staff, and was a member of the Clinic's Technology Transfer Advisory Committee.  He represented the Marshfield Clinic Research Foundation Board of Trustees ("the Board of Trustees") on the Clinic's Investment Committee.

15.     Wesbrook previously served for two years, in addition to his responsibilities at the Research Foundation, as the Treasurer and Chair of the Finance Committee of the Diagnostic and Treatment Center ("DTC"), which is located in Weston, Wisconsin.  The DTC is a $60 million joint venture of Marshfield Clinic and Ministry Health Care, a large Catholic hospital system.  He was commended by both organizations for his "leadership and service" and for "having laid the groundwork for a future of quality clinical care and service excellence for our patients from throughout North Central Wisconsin."

16.     Wesbrook also represented the Clinic as a Member of the Board of Directors of PreventionGenetics, LLC, a clinical genetic testing company located in Marshfield, Wisconsin in which the Clinic owns a 9.4% share.

17.     Wesbrook has an excellent reputation among Wisconsin's medical research leadership, as evidenced by his selection in 2008 by the leadership of the University of Wisconsin School of Medicine and Public Health, Medical College of Wisconsin, University of Wisconsin-Milwaukee, and Marshfield Clinic to serve as the Executive Director of the Wisconsin Genomics Initiative.

18.     During the decade that Wesbrook was an employee of Marshfield Clinic, he received exemplary annual performance reviews from three different Directors of the Research Foundation and merit-based salary increases every year the Clinic authorized such increases to be awarded.  Wesbrook also received 360-degree assessments, in which he was evaluated by up to 25 scientists, physicians, and staff with whom he worked closely.

19.     Wesbrook's 2009 and 2011 assessments were not only exceptional, but were substantially better numerically and in evaluator comment than those of the Clinic President, Vice President, and every other member of the Clinic Board of Directors who received such an assessment.  Wesbrook's highest average scores on these 360–degree assessments were for integrity (6.33 on a scale of 1 to 7), treating people with respect (6.13), and representing Marshfield Clinic (6.41).

20.     During Wesbrook's tenure as Deputy Director, staff satisfaction at the Research Foundation achieved its highest levels since the Clinic began to measure it

quantitatively in the mid-1990s and new external multi-year research grants and contracts tripled to over $20 million per year in 2011.

21.     Wesbrook's direct supervisor was Research Foundation Director Dr. Humberto Vidaillet ("Vidaillet").   Like his supervisor, Wesbrook worked under the authority of the Board of Trustees and his duties required him to be responsive to the Board of Trustees, its Executive Committee, and its Chair.  Both the Research Foundation Board of Trustees and Vidaillet advised Clinic President Ulrich and the Marshfield Clinic Board of Directors on multiple occasions that Wesbrook's performance was exceptional and that he was an important factor in the success of the Research Foundation.

## ULRICH'S ATTEMPTS TO SHIFT OVERSIGHT OF FUNDS DONATED FOR RESEARCH TO THE CLINIC'S CORPORATE EXECUTIVES AND WESBROOK'S ACTIVITIES IN SUPPORT OF TRUSTEES' OPPOSITION TO THAT CHANGE

22.     The Research Foundation Board of Trustees is the only authoritative body in Marshfield Clinic that is not under the authority of the Clinic President.  The Board of Trustees reports directly to the Clinic Board of Directors, and thus its supervising body is also the Clinic President's supervising body.  The Clinic President is one of 20 equal members of the Board of Trustees, serving as an *ex officio* voting member.

23.     Ulrich tried and failed three times between May 2008 and September 2011 to reduce the independence of the Board of Trustees and to have oversight of the Research Foundation's $30 million in endowments and other funds donated for research transferred from the Research Foundation Trustees to the Clinic's corporate executive leadership.

7

24.     At the direction of Vidaillet and two successive Chairs of the Board of Trustees, Wesbrook organized due diligence and other staff support for the Trustees. As a result of concerns expressed by the Board of Trustees to the Marshfield Clinic Board of Directors, the Clinic Board rejected each of Ulrich's attempts, thereby preserving the independence and fiduciary responsibilities of the Board of Trustees and protecting donor interests.

25.     The Board of Trustees relied on the analysis and support that Wesbrook had organized in successfully retaining its historic role in the governance of the Research Foundation and its ability to manage endowments and other donated funds in accordance with Wis. Stat. 112.11 *et seq.*, the Wisconsin Uniform Prudent Management of Institutional Funds Act ("UPMIFA").

26.     Wesbrook also personally wrote one of the most influential papers during the due diligence process arguing in it that the removal of funds donated for research from the oversight of the Trustees without their consent; without following due process established by State courts; and without proving to a Wisconsin court that the transfer of such donated funds from Trustee oversight to the control of the Clinic's corporate executive leadership was in the best interests of donors, rather than the interest of Marshfield Clinic and its Officers, would violate both UPMIFA and the Trustee's fiduciary responsibilities.

27.     Wesbrook met personally with Ulrich when the proposal first surfaced in draft in May 2008 and explained to him the law governing donated funds; encouraged him to consult directly with the Trustees (which he refused to do); and suggested that if

the Clinic corporate leaders were determined to proceed in this direction they engage an external attorney with expertise in donated funds to advise the Clinic's Officers and its Board of Directors.

28.     Ulrich's response was to verbally reprimand Wesbrook for "trying to stir up trouble."

29.     As a direct result of Wesbrook's support to the Board of Trustees in defeating Ulrich's next attempt in late 2009 to gain control of research endowments and other funds donated for research, Clinic Vice President Dr. Douglas Reding directed that negative information be placed in Wesbrook's official personnel file.

## ULRICH'S FIRST TWO DRIVES TO CHANGE THE CLINIC'S GOVERNANCE STRUCTURE AND WESBROOK'S ACTIVITIES IN SUPPORT OF HIS SUPERVISOR'S OPPOSITION TO THAT CHANGE

30.     During the period material to this complaint, Marshfield Clinic was one of a few 501(c)(3) corporations that had Shareholders.  From its founding in 1916 to 2008, its governance structure was modeled on a town-hall democracy.  All physicians who remained at the Clinic after a period as an Associate purchased one share in the Clinic, which they sold back to the Clinic upon retirement or resignation.  All Shareholders were also Directors of the corporation.  The Shareholders/Directors elected the President, Vice President, Treasurer, and Secretary for two year terms.  These four Officers along with five other elected physicians served as the Executive Committee of the Board of Directors to manage operations.

31.     The powers of the Office of the President and of the Executive Committee were limited by a system of checks and balances; requirement of transparency in

9

decision-making; adherence to due process; the ability of every physician to make motions regarding Clinic policies; and the right to appeal actions by the Officers and other physician-administrators to the full Board of Directors.

32.     Most major financial and policy decisions required the approval of the Shareholder/Directors and were debated openly at Shareholder/Director meetings that in the last decade routinely had over 300 participants present, with others voting by proxy.  All physicians had equal rights and obligations to participate in governance, irrespective of whatever office they might temporarily have been awarded by their colleagues through the electoral process.

33.     With a Board of Directors then approaching 600 Members and new income reporting requirements for corporate directors, in late 2008 Clinic Shareholders/Directors approved a change in By-Laws that in effect changed governance from a town-hall democracy to a representative democracy.  Shareholders changed Clinic By-Laws so as to eliminate universal Director status for Shareholders and create an elected 23 physician-member Board.  This Board included the nine members of the Clinic Executive Committee (the four Clinic Officers and five additional physicians elected at large) and two Directors from each of the Clinic's seven Medical Divisions elected by the Shareholders in each division.

34.     In 2009, Shareholders again changed Clinic By-Laws so as to eliminate the Clinic Executive Committee, create an 18 physician-member Board of Directors (the four Clinic Officers and 14 Divisional representatives), and transfer to the Board of Directors the functions previously performed by the Executive Committee.

10

35.     In July 2008, Ulrich brought a more radical proposal to the Shareholder/ Directors for approval asking, in effect, that the Shareholder/Directors approve new By-Laws that would change the Clinic's physician-led, democratically-modeled governance structure to that of a more typical corporation.  In this proposal, physicians would give up their status as Shareholders and become Class A employees.  Marshfield Clinic would be restructured as the Marshfield Clinic Health System, Inc. (hereafter "System"), with broad powers concentrated in the office of a System CEO.

36.     Under this proposal, the Clinic's elected all-physician Board of Directors was to be replaced by a System Board with a majority of independent public members. The System CEO would no longer be elected by physicians, but would be selected by the new System Board.

37.     Under this proposal, Clinic President and CEO Ulrich would automatically be instated as the Interim System CEO, a position that would give him substantial influence over the selection of new public members of the System Board.

38.     Vidaillet believed the proposed change in governance would damage the Clinic, its Shareholders, its community, and its ability to provide high-quality accessible healthcare.  In accordance with his fiduciary duties as a Member of the Board of Directors, Vidaillet strongly opposed these restructuring plans.

39.     Shareholders defeated Ulrich's July 2008 governance restructuring proposal, as well as similar proposals presented to Shareholders in June 2009 and September 2011.

11

40.     Vidaillet emerged as the principal leader of what became known as the "pro-democracy opposition," and was blamed by Ulrich and his supporters for the defeat of all three restructuring proposals.

41.     Vidaillet had sought and received Wesbrook's assistance in meeting Vidaillet's fiduciary duties by gathering accurate information, conducting analysis, and assisting him in preparing correspondence and other materials to use in campaigning against the governance change proposals.  Ulrich was aware that Wesbrook provided this support.

42.     Ulrich expressed to others his resentment of Wesbrook's involvement and his desire to curtail or eliminate it entirely by various means, including termination of Wesbrook's employment.

43.     However, Ulrich did not have the unilateral authority to fire Wesbrook.

**ULRICH, LACKING THE AUTHORITY TO FIRE WESBROOK, BEGAN A CAMPAIGN TO HAVE WESBROOK TERMINATED BY DISCREDITING HIM WITH FALSE INFORMATION**

44.     Ulrich, after the second defeat of his governance restructuring proposal, nevertheless decided to cause Wesbrook's employment to be terminated in order to eliminate Wesbrook's assistance to Vidaillet and the pro-democracy opposition.

45.     In April 2010, three months after Vidaillet ran for election against Ulrich for Clinic President and came within 36 votes out of 500 of unseating him, Ulrich asked the Clinic Board not to reappoint Vidaillet for a second term as Research Foundation Director, with the expectation that Wesbrook would subsequently be dismissed by the new Ulrich-appointed Interim-Director.  Ulrich falsely claimed that 15 successful

12

scientists had left the Research Foundation due to a climate of fear and intimidation established by Vidaillet and Wesbrook.

46.     The Board of Directors, however, cited the Research Foundation's record of accomplishment under the leadership of Vidaillet.  It also noted that Ulrich had provided the Board no documentation or other evidence to support his allegations.  The Board voted to delay a decision in order to give Ulrich time to document his allegations. It also told the Research Foundation Board of Trustees to conduct its own assessment of Vidaillet's performance and report back with a recommendation.

47.     Ulrich thereafter directed the Director of Human Resources to investigate Wesbrook as well as Vidaillet.  This was the first time in Clinic history that a Clinic President made the evaluation of a Division's non-physician administrator part of the decision of whether to reappoint a Division's physician Medical Director.

48.     When Wesbrook wrote to Ulrich asking to be notified of what he was being investigated for, Ulrich refused to answer.  He also refused Wesbrook's request to be informed of the outcome of the investigation by the Director of Human Resources and given a chance to respond before the issue was brought back to the Board of Directors for decision.

49.     In response to the guidance from the Clinic Board of Directors that the Research Foundation Board of Trustees assess Vidaillet's performance, the Chair of the Board of Trustees appointed an *ad hoc* committee to prepare a response.  The Executive Committee of the Board of Trustees also separately conducted a thorough analysis of scientist attrition.

13

50.     During the period in which these assessments and analyses were being conducted, Ulrich undertook three new attempts to have the Board of Directors fire Wesbrook.

## ULRICH THREATENS TO SUE THE UNIVERSITY OF WISCONSIN SCHOOL OF MEDICINE AND PUBLIC HEALTH (UWSMPH)

51.     In May 2010 Ulrich told the Clinic Board of Directors that there was "a traitor in our midst" that needed to be identified and fired as punishment for "leaking" confidential information.  Ulrich showed the Board a copy of the letter he would send later that week to UWSMPH Dean Dr. Robert Golden ("Golden") threatening to sue the University based on an internal email that Senior Associate Dean Dr. Marc Drezner ("Drezner") had sent to Golden.  Ulrich had been given a copy of the email by Frederick J. Wenzel ("Wenzel"), who had been lobbying Ulrich and other Clinic leaders for a seat on the new Clinic Board of Directors if Ulrich's governance change proposals were approved by Shareholders.   Wenzel was subsequently rewarded with such an appointment.

52.     Ulrich told the Board that Drezner had characterized Ulrich's efforts to remove Vidaillet as Research Foundation Director as being "politically motivated." Ulrich was offering UWSMPH that the Clinic would not sue if either Drezner or Golden would reveal the original source of their information.  Vidaillet stated that he no prior knowledge of these events.

53.     UW-Madison and Marshfield Clinic Research Foundation had been jointly awarded a $40 million Clinical and Translational Science Award by the National

14

Institutes of Health ("NIH") in 2007 that was approaching competitive renewal. Vidaillet was the scientific leader of the Marshfield component and Wesbrook the senior research administrator.  Because both were listed as "key personnel" in the grant, NIH regulations required that it be notified if there was a change in the status of either.  Also, NIH was scheduled to visit to Marshfield in August.  It would have been Wesbrook's duty to UW-Madison to inform Drezner, who is the Executive Director of the Institute primarily funded by the grant, of the recent events.  However, Golden would not yield to Ulrich's demands to give up his source of information, and Ulrich withdrew the threat of legal action.

### MARTIN JOINS ULRICH'S CAMPAIGN TO GET WESBROOK FIRED

54.     The next attempt undertaken by Ulrich and now joined by Martin to have the Board of Directors fire Wesbrook resulted directly from assistance Wesbrook provided Vidaillet in meeting his fiduciary responsibilities as a Member of the Clinic Board of Directors.  It was prompted by a memorandum Wesbrook wrote to Vidaillet in May 2010 describing the content of an on-line seminar presented by the law firm McDermott, Will & Emery, which Vidaillet subsequently forwarded to all Board Members.  The memorandum provided information to the Board about IRS policies regarding governance of charitable tax-exempt organizations, which was particularly relevant to the Clinic governance change proposal.  Wesbrook's report also included copies of original documents concerning the Clinic's 501(c)(3) application and IRS approval, which were given to Wesbrook by Clinic Executive Director Reed Hall

("Hall").  Hall, who had orchestrated the Clinic's 501(c)(3) application in 1989-90, reviewed and commented favorably on Wesbrook's report.

55.     Wesbrook's memorandum, which contained information that directly contradicted assertions that Ulrich and others had previously made to the Board about IRS policy in general and about specific IRS decisions concerning Marshfield Clinic, was discussed at a Board of Directors off-site retreat and at least two other Board meetings. Those Directors who opposed the governance change proposal wanted to know why they had learned of the IRS guidelines from Wesbrook and why Directors and Shareholders had been told by Clinic leadership for two years just the opposite.

56.     On July 27, 2010, Ulrich told the Board that Wesbrook had recently placed a call to McDermott, Will & Emery and left a voice message with a lawyer asking for a return call.  Without any inquiry into the facts, Martin falsely alleged that Wesbrook engaged in wrongdoing and insisted that Wesbrook be fired on the spot and escorted out of the Clinic by security guards.  Other Directors pointed out that the Clinic could not terminate an employee simply for the act of calling a lawyer.

57.     As Martin's proposal received no support, Martin thereafter declined to make a formal motion that the Board fire Wesbrook.

58.     The Board did ask Ulrich and Vidaillet to convey to Wesbrook that it was the Legal Department's job to engage external legal counsel regarding Clinic business, without making a judgment as to whether Wesbrook had or had not done so (which he had not).

59.     On July 28, 2010, Ulrich sent Wesbrook a letter which far exceeded the Board of Directors' guidance, falsely stating that Wesbrook was not permitted to "…concern yourself in any regard on the topics of Marshfield's current or future governance structure…" and closing with: "I trust that this message is clear."   Ulrich's intent to try to intimidate Wesbrook into ceasing to support Vidaillet in his role as a Clinic Director was clear, but Ulrich's directive was improper and unenforceable for multiple reasons and the matter ended.

60.     A month later, Ulrich launched his next attempt to have Wesbrook's employment terminated.   The triggering event was an action by the Research Foundation Board of Trustees at its August 2010 meeting.

61.     The Executive Committee of the Board of Trustees had completed its analysis of the scientist attrition and forwarded to the full Board of Trustees its report, *"Scientist Attrition at MCRF, 2005 to 2010: The Consequences of Setting Productivity Standards and Holding People Accountable to Meet Them"* ("Scientist Attrition Report"). Wesbrook coordinated the preparation of the report for the Trustees and was its principal drafter.

62.     The report provided information on the primary responsibilities of scientists employed by the MCRF, productivity requirements for MCRF scientists, and statistical data on attrition rates.   The report presented facts regarding the departures of each of the nine scientists who left employment at MCRF during the relevant period. It compared the financial productivity of the departing scientists to the productivity of the

17

scientists hired to replace them.  The report discussed the impact of a new Financial Productivity Criteria Policy and revisions of the Tenure Policy, both of which increased productivity standards for MCRF scientists.  Finally, the report provided data on annual staff surveys, which demonstrated an increase in staff satisfaction over the relevant time period.

63.     The report established that the allegations by Ulrich and his allies that 15 well-qualified scientists departed MCRF due to a hostile climate were false.

64.     The report also demonstrated that Ulrich knew the allegations were false when he first made them to the Clinic Board of Directors in April, as were similar allegations by Dr. Michael Caldwell ("Caldwell") and Dr. Ray Haselby in what appeared to be an orchestrated campaign of false information and unsubstantiated allegations designed to influence the decisions of the Research Foundation Board of Trustees and the Clinic Board of Directors.

65.     The full Board of Trustees endorsed the Scientist Attrition Report by a vote of 14 to 3 and forwarded it to Ulrich on September 1, 2010.  The Trustees also passed a formal Resolution expressing their "appreciation and support for the current Research Foundation scientists and Administration for their outstanding performance," which was also forward to Ulrich for the Clinic Board.

66.     On September 2, 2010, the day after Ulrich received the Scientist Attrition Report and the accompanying Resolution from the Research Foundation Trustees, Ulrich informed Vidaillet that Ulrich was firing Wesbrook effective immediately.

18

67.     The next day, Ulrich told the Board of Directors by email that "I have come to the conclusion that Steve Wesbrook should not continue in the role or Deputy Director of the Marshfield Clinic Research Foundation."

68.     Ulrich thus became the first Clinic President to presume to have the authority to fire a Senior Administrator who worked directly for the physician Medical Director of one of the Clinic's Divisions, and also the first Clinic President to presume he could do so without regard to the Clinic's long-established due-process procedures.

69.     On September 3, 2010, Vidaillet requested by email that the Board of Directors overturn Ulrich's decision to terminate Wesbrook, writing in part:

> "For over three years I have disagreed with Dr. Ulrich on issues related to governance.  I have been an outspoken critic of converting to any non-democratic system without due diligence and without making the business case. . . .  It is . . . well-known to you that Dr. Wesbrook, among others, has helped me gather information, organize my thoughts, and prepare documents, as any good Deputy would do on many issues important to our organization including governance. . . .  As I see it, Dr. Ulrich faced a dilemma.  I believe he felt the need to politically neutralize me. . . .   The obvious answer is to fire my partner. . . .   He took the matter out of the BOD's hands and he preempted any examination of the facts by you.  He fired Dr. Steve Wesbrook without notice, without investigating the allegations, without any opportunity for defense, and with total disregard for the due-process procedures we accord to all of our employees."

70.     The Board also received letters from Research Foundation Center Directors, the Senior Dean of UW-Milwaukee who is a Member of the Executive Committee of the Wisconsin Genomics Initiative, and other Board Members, including Dr. Wallace Brucker ("Brucker") who wrote in part:

> "I would like to go on the record as being strongly opposed to this ill-advised decision…. I have to assume the decision to fire Dr. Wesbrook stemmed, at least in part, from his involvement in gathering a non-binding, legal opinion that change in governance at the Marshfield Clinic may not be needed in order to comply with IRS 501(c)3 rules ….   I would like to remind all the members of the

19

board that this opinion was given to Dr. Vidaillet, who, in keeping with his fiduciary responsibilities as a Member of the Board, brought relevant information to the board for its consideration ….   As we noted at the last board meeting, many of our fellow shareholders are troubled by the perceived lack of transparency in our deliberative process.  We risk adding to this air of suspicion and mistrust through actions such as this one.  Fire dissenters, muzzle the outspoken, and bring charges against those with whom you disagree are not the tools of a democracy."

71.     The Director of the Research Foundation's Biomedical Informatics Research Center, Justin Starren, M.D., Ph.D., highlighted to the Board of Directors in his email that Ulrich violated long-standing Clinic policies approved by the Clinic Board of Directors:

"I spent much of last Friday trying to deal with staff reactions to the news of Dr. Wesbrook's sudden termination.  It is important for you understand the impact this has had on the MCRF staff.  Dr. Wesbrook's termination is being described as a "shot across to bow to Dr. Vidaillet".  Someone asked if it was "an assassination."  Everyone who had worked for the clinic more than a couple months knows that the clinic has very meticulous processes for termination, which often take months, or even years, to complete."

72.      On September 7, 2010, the Board of Directors reversed Ulrich and reinstated Wesbrook.  On September 9, 2010, Ulrich sent Wesbrook a letter communicating the Board's decision:

73.     Two weeks later the Clinic Board of Directors reappointed Vidaillet to a second term as Research Foundation Director and Clinic Director of Medical Research, and in so-doing recognized the success of the Vidaillet-Wesbrook leadership team.

74.     Eventually the Board of Directors deferred the investigation into the allegations against Wesbrook to the Research Foundation Board of Trustees.  In a January 4, 2011 letter to the Clinic Board of Directors, the Trustees strongly supported Wesbrook and the matter ended.

## **WESBROOK PRODUCES EVIDENCE THAT THE CLINIC MAY HAVE BEEN INVOLVED IN VIOLATIONS OF FEDERAL MEDICARE LAWS**

75.     From 2008 to 2011, Marshfield Clinic received payments of up to $500,000 a year from Sacred Heart Hospital in Eau Claire, Wisconsin, for the consulting services of Dr. Kamal Thapar ("Thapar"), a Marshfield Clinic physician practicing in Eau Claire, Wisconsin.

76.     During the first week of August 2011, while providing analytical support to Vidaillet, Wesbrook became aware of facts and circumstances surrounding the dismissal of Steve Ronstrom, the Administrator of Sacred Heart Hospital in Eau Claire, related to the payments for consulting services by Thapar.  Wesbrook had previous knowledge of the unusual number of resignations of Marshfield Clinic physician-administrators and a Division Administrator of the Clinic's Western/Northwestern Division.

77.     Wesbrook recognized that the dismissals and resignations may have been the result of violations of prohibitions of the Stark Law (42 U.S.C. 1395nn).

78.     On August 5, 2011, Dr. Humayun Khan ("Khan"), a Member of the Board of Directors from Eau Claire, asked Ulrich to place the topic on the agenda of the August 9 Board meeting.   On August 8, Khan sent an email to his colleagues on the Board of Directors, which stated in part:

> "This Board of Directors has an absolute duty to ensure this case is thoroughly investigated and the Clinic takes appropriate action….  It is not so much a matter of trust but of common sense and good business practices that the Board not rely on the Clinic President and General Counsel [who were directly involved in approving the arrangement and transfer of funds to Marshfield Clinic] alone to provide this information and analysis.  If federal agents are investigating this, everything will come out sooner or later….  Therefore, I propose that the Board

21

of Directors appoint an independent Special Investigator to determine the facts in this case."

79.    At Vidaillet's request, Wesbrook conducted research on the responsibilities of corporate Board members in such circumstances.  Based on that research, Wesbrook recommended that Vidaillet request that the Board start an internal investigation, either by a special investigator or the Board of Directors itself.  Wesbrook assisted Vidaillet in drafting his subsequent correspondence and motion to the Board.

80.    On August 9, 2011, Khan's motion was defeated by the Board of Directors in closed session, with only Vidaillet, Khan, and Brucker voting for the motion to investigate.

81.    The morning of September 6, 2011, Vidaillet sent a message to all Members of the Board of Directors stating his intent to introduce at the meeting later that day a resolution requiring the Board to begin an internal investigation.  In this message, he stated in part:

> "While there is much written about this topic, one of the references I would encourage you to read in its entirety is, 'Corporate Responsibility and Corporate Compliance:  A Resource for Health Care Boards of Directors.' This guidance document, prepared jointly by the Office of Inspector General of the U.S. Department of Health and Human Services and the American Health Lawyers Association, has an excerpt that is particularly pertinent to our current situation. It reads, '… The duty to make reasonable inquiry increases when suspicion are aroused or should be aroused; that is, when the director is presented with extraordinary facts or circumstances of a material nature (e.g., indications of financial improprieties self-dealing, or fraud) or a major governmental investigation….'"

> Corporate boards have a responsibility to look into reasonable cause suspicions or direct allegations that the CEO and other senior corporate officials may have behaved unethically, illegally, or in some other way that could potentially damage the corporation.  If the CEO or other senior officials are involved, they cannot investigate themselves.  This leaves Boards of Directors as the only body

22

which can protect the interests of the organization and those we serve other than external regulatory bodies and government authorities.

Whether you realized it at the time, and whether or not you like it now, the fact is that the day you were told of possible Stark law violations (and possible criminal misconduct) is the day the ball got passed to you.  Everything done or not done by Marshfield Clinic from that day forward is now your responsibility. You can ignore it, hope it gets solved by HSHS [Hospital Sisters Health System] or otherwise goes away, but that is not the ethical thing to do and it could be very risky, not just for the organization but for each one of you personally.  Or you can step up and meet the expectations of the law, the public, the Shareholders, and our own external auditors (this won't escape their attention) by conducting a thorough, good-faith internal investigation as soon as possible to uncover the facts in this matter.

82.     Ulrich blocked Vidaillet's motion for an internal investigation from any consideration by the Board on grounds that it had not been provided to him at least 24 hours in advance.  Thus, Vidaillet sent a second memorandum entitled "Motion for the Board of Directors to begin an internal investigation."

83.     In early September 2011, Ulrich and Clinic General Counsel Barbara Kuhl ("Kuhl") directed that the Clinic's Information Services Department to begin to monitor daily Wesbrook's email correspondence because of Ulrich's suspicions that Wesbrook might be a whistleblower and report his concerns about Medicare fraud to the Department of Health and Human Services ("DHHS") Office of the Inspector General ("OIG").

## ULRICH COORDINATES A
## NON-PRIVILEGED THREE-MONTH CAMPAIGN TO
## HAVE WESBROOK FIRED

84.     From September to December 2011, Ulrich coordinated with Martin and Senior Research Scientists Belongia and Lee a sustained campaign to have the full Board of Directors fire Wesbrook.

85.     Ulrich and Martin each anticipated powerful leadership roles and salary increases if the governance change proposals passed.  Ulrich expected to become the Interim System CEO and Martin the Clinic Vice President.

86.     It was widely expected that Vidaillet would be Ulrich's principal opponent in the upcoming January election if the governance change proposal succeeded.  By inducing the Board of Directors to terminate Wesbrook, Ulrich and Martin would damage Vidaillet's potential candidacy and enhance their own prospects.

87.     Ulrich and Martin were also aware that a potential Medicare fraud scandal would almost certainly result in the defeat of the governance change proposal upon which Shareholders were to vote at the end of September.  They were intent on keeping all information related to this from Shareholders until at least after their governance change proposal was passed.

88.     Ulrich and Martin were also motivated to eliminate Wesbrook to prevent him from assisting Vidaillet and Khan in pressing concerns about Medicare fraud further or reporting his concerns directly to federal compliance agencies.

89.     Beginning in October Ulrich's and Martin's motivation and efforts to have Wesbrook fired by the Board increased when Wesbrook began to report to General

24

Counsel and Chief Compliance Officer Kuhl, Research Foundation Board of Trustees Chair Dr. Mark Nook, and the Research Conflict of Interest Committee Chair evidence he had uncovered of fraud against the State of Wisconsin.

90.     Ulrich's and Martin's campaign to have Wesbrook fired intensified further in November due to Wesbrook's assistance to Directors Vidaillet, Khan, and Brucker in their attempts to investigate suspicions of fraud against Shareholder perpetrated by Ulrich and Martin with respect to a so-called "bonding crisis."

91.     Ulrich knew that the Research Foundation's Board of Trustees strongly supported Wesbrook.  Therefore, he turned to Belongia and Lee for assistance.

92.     On information and belief, Ulrich, Belongia, and Lee met and corresponded regularly to coordinate a campaign to damage Wesbrook's professional reputation and cause him to be removed as Deputy Director.  Belongia and Lee individually took direct action to cause this to happen.

93.     Belongia's motivation was rooted in his personal animosity toward Wesbrook, which he conveyed to many people at various times verbally and in writing.

94.     Lee's motivation for interference include the fact that her leadership of the National Farm Medicine Center was under scrutiny by Vidaillet and Wesbrook because under Lee's leadership this center had deteriorated to a situation where it had fewer employees and generated less new grant revenue annually than at any time in the past decade; because of complaints about Lee's conduct toward subordinates; and because Lee had recently received the lowest 360 Degree Assessment of any Center Director in

the past decade, containing multiple negative comments about discrimination,

employee abuse, and lack of integrity.

### COORDINATED EFFORTS TO HARM WESBROOK'S REPUTATION AND LOWER HIM IN THE ESTIMATIONS OF MEMBERS OF THE BOARD OF DIRECTORS

95.     As the Clinic Board of Directors had reversed Ulrich when he fired

Wesbrook in September 2011, Ulrich and Martin with assistance from Belongia and Lee

took a number of defamatory communications and actions to damage Wesbrook's

reputation as a precursor to having him terminated.

96.     On July 15, 2011 Belongia and Lee sent a letter to Ulrich proposing

changes in the job requirements of the MCRF Director, specifically that the Director be

required to spend 80 percent time on administration and research.  The effect of this

change would have been to require Vidaillet to give up his clinical practice as a

cardiologist, as he was seeing patients two days a week (40 percent time), or his seat on

the Marshfield Clinic Board of Directors, which consumed about 10 -15 percent of his

time.  Ulrich presented the proposal to the Clinic Board of Directors, which requested

that the MCRF Board of Trustees assess the proposal first.   The Board of Trustees

Executive committee unanimously recommended in a letter on August 25 to the full

Board of Trustees that the Belongia-Lee proposal be rejected, which the full Board of

Trustees did by a vote of 15 to 2 on August 25, 2011.  In his August 28 letter conveying

that recommendation to Ulrich and the Marshfield Clinic Board of Directors, Board of

Trustees Chair Dr. Mark Nook, Vice Chancellor for Academic Affairs of the University

of Wisconsin System, not only expressed the opposition of the Trustees to the proposal

but praised the Vidaillet-Wesbrook leadership team:  "Additionally, the current dyad team serving the MCRF has shown proven results in managing the research endeavors of the MC and MCRF."

97.     At the Board of Directors' meeting on September 6, 2011, Ulrich reshaped what was advertised as a discussion of the Belongia-Lee proposal and the Board of Trustee recommendations, into an attempt to fatally damage Wesbrook's reputation, especially with those Members of the Board of Directors that had voted to restore Wesbrook the year before.

98.     Although Wesbrook's name was not mentioned in the Belongia-Lee letter, and the Board of Trustee Executive Committee had in its letter stated that "Given the full context of this [Belongia-Lee July 15] letter, using any of the cited examples for purposes of evaluating the current Director or Deputy Director would be unethical," and Wesbrook's name was not mentioned once in the 2-hour discussion of the full Board of Trustees on August 25th, Ulrich and Martin devoted approximately 75 percent of the time, over three hours, in an attempt to attack Wesbrook.

99.     Ulrich refused to inform Wesbrook of the allegations against him, would not permit him to be present to defend himself against them, would not allow him to appear before the Board to answer questions or give information in his own behalf, and never provided Wesbrook even a summary of the proceedings on the grounds that the Board had met in Executive Session.

100.     Moreover, Vidaillet was forced to leave the Board meeting for this discussion.

101.    Ulrich refused a written request from Board of Trustees Chair Mark Nook to allow Vice Chair Dr. Jaime Boero ("Boero") to be present as a representative of the Trustees.   Ulrich also rejected Boero's personal written request to observe, in which Boero argued both his duty as a Trustee and his rights as a Shareholder.

102.     However, in the last few minutes of this six-hour Board meeting Ulrich secured a majority vote for a motion made by Dr. Matthew Thomas ("Thomas"), a strong supporter of Ulrich and Martin, and seconded by Martin allowing Ulrich to place Wesbrook on a performance improvement plan.  Given the criteria in Marshfield Clinic policy for placement of an employee on such a plan, Martin was telling the Board that Wesbrook's performance and/or behavior was so bad that he would be given one last chance to change before being fired.  This was clearly intended to harm Wesbrook's reputation and standing.

103.    The motion was amended to include the condition that Ulrich and Vidaillet agree on the content of the plan and that the plan be brought back to the Board for approval, which passed.

104.    September 20, 2011 Vidaillet to the Members of the Board of Directors entitled "Additional Changes to the Exec Sess Minutes of September 6, 2011," in which he requests that Dr. Martin's motion to have him, a duly elected Member of the Board, be physically removed by security during the proceedings be added to the minutes.  He also objects to the conduct of the proceedings, including the extensive admission of hearsay and unproven allegations, stating in part:

"It would be inappropriate for Dr. Ulrich's personal investment in this matter be allowed to turn this into another 'witch hunt,' [*sic*] as he has with me and Dr. Wesbrook ever since I opposed governance restructuring and running against him for the position of Clinic President. I also request that the minutes of this meeting show that I categorically oppose this type of Star Chamber Hearing that this body has been conducting where the testimony is taken in secret, the accused are not allowed to participate, the accusers cannot be cross examined and the decisions are made in secret  Lastly, I want the record to show that for the reasons noted above and others, that I believe that the process is retaliatory."

105.    On October 5, 2011, Ulrich summoned Vidaillet to discuss Ulrich's proposed performance improvement plan.  Vidaillet told Ulrich that the document was not a performance improvement plan, was not acceptable, and that he was prepared to take the issue to the Board.   Vidaillet stated that it was against the law for Ulrich to retaliate against someone Ulrich believed might be a Federal whistleblower.

106.    Ulrich placed the performance improvement plan on the Board's October 11, 2011 agenda, and on October 10 Vidaillet wrote an email to Board Members that included the following:

"Please recognize that Dr. Ulrich's so-called 'Performance Improvement Plan' is an outrageous and obvious attempt to retaliate against me by once again attacking my Deputy Director with the intent of firing him…. This has nothing to do with performance of Dr. Wesbrook or something he even has the power to do.  This plan is not meant to identify improvement opportunities.  It is designed to make sure the subject fails…. Essentially, Dr. Ulrich is requiring me to overhaul MCRF's operating infrastructure and processes or face the prospect of my Deputy being fired…. It is just the most recent of Dr. Ulrich's many attempts to retaliate against me for my political opposition.  Every time he has failed to fire me he has immediately gone after Dr. Wesbrook.  He has so far failed because his attacks have been totally unwarranted and without any basis in fact, and because Dr. Wesbrook's accomplishment are so substantial and the MCRF Board of Trustees has given Dr. Wesbrook its strongest support.  The political retaliation has got to stop.  Dr. Ulrich needs to come to the realization that he will not be leading this organization going forward…. The Board cannot let him use his last 90 days as Clinic President to punish those he blames for not being able to become CEO for life."

29

107.    At the October 11, 2011 Clinic Board of Directors meeting, there was a long discussion of the proposed performance improvement plan.  In that context, Directors addressed the arrangement with Sacred Heart Hospital regarding Dr. Thapar and Wesbrook's involvement in bringing the potential Medicare violations before the Board.  The possibility that Wesbrook was or might become a Federal whistleblower was specifically discussed.  At least one Director requested that this possibility be investigated.

108.    Despite the fact that the Board had been informed of the whistleblower protections contained in the Federal False Claims Act,  Thomas made a formal motion that the Board immediately relieve Wesbrook of his duties.  However, it was replaced by a motion from Martin to remove Vidaillet as Director of the Research Foundation for "insubordination."  The rationale in removing Vidaillet was in large part that Wesbrook could be dealt with later by a new Research Foundation Director in a way that would circumvent Federal False Claims Act whistleblower provisions.

109.    On October 25, 2011, the Board voted on Martin's October 11 motion to remove Vidaillet as Research Foundation Director.  The motion failed.  The Board subsequently approved a motion that the question of Wesbrook's performance improvement plan would be part of the Board's scheduled March 2012 evaluation of Vidaillet in regards to whether to extend his appointment as Director of the Research Foundation for a third term.

## WESBROOK BRINGS FORWARD ADDITIONAL CONCERNS ABOUT FRAUDULENT ACTIVITIES

110.    On September 20, 2011, Wesbrook sent an email to the Office of the General Counsel that reported the likelihood, based on documents he was given by the Division of Applied Sciences, of misrepresentation and potentially fraud involving $144,000 of State of Wisconsin money.  At the core was a false statement by Marshfield Clinic's technology transfer contracted agent, Dr. Maliyakel John ("John"), who is Managing Director of WiSys, and Caldwell, who was co-owner of McDel Topology, LLC ("McDel").  Both had represented to the State in writing that Marshfield Clinic Research Foundation had provided $155,000 as matching support in order to secure a $144,000 WiSCAP grant for McDel. The Research Foundation had not provided such matching funding to McDel.

111.    On October 6, 2011, the Research Conflict of Interest Committee completed three months of work addressing the request of Caldwell to form McDel. This Committee was established by the Clinic; was chaired by a lawyer from Legal Services; and was broadly representative of distinguished physician-investigators, administrators, and community members experienced in research.  The Committee concluded that there was a conflict of interest and that it could not be managed.

112.    Caldwell immediately appealed this decision to Ulrich, who directed that the appeal be heard by the Clinic's Audit and Compliance Committee chaired by Martin.  Due to the unexpected resignation of two of the four independent community members, this Committee had at the time only five voting members besides the Chair,

three of whom were Members of the Clinic Board who strongly supported Ulrich and governance change.  Kuhl provided the Committee its legal support.

113.    Wesbrook's notification of potential compliance violations to the General Counsel resulted in Wesbrook being chastised for "an inappropriate and potential abuse of process."

114.    Thereafter, Wesbrook alerted Board of Trustees Chair Nook of "a potential serious issue affecting MCRF."

115.    Wesbrook was aware that Deputy General Counsel Van Den Heuvel ("Van Den Heuvel"), who worked with the Research Foundation on research contracts and served as the Staff Counsel to the Clinic Technology Transfer Advisory Committee, had started a rigorous investigation with the intent of getting to the facts irrespective of where they took him.  The initial results, as reported to the Technology Transfer Advisory Committee, confirmed Wesbrook's concerns of potential fraud.  However after Van Den Heuvel's initial findings were communicated, Kuhl effectively halted his investigation through the ruse of giving him "higher priority" tasks.

116.    At the October 11 Board of Directors meeting, Vidaillet informed the Board of Directors of his concerns that the Clinic not only was connected to the misrepresentation regarding matching funding but also that General Counsel Kuhl was not seriously investigating.  He stated that, as the Director of the Research Foundation, he was sending a written request for a thorough investigation to the General Counsel, with a copy to the Chair of the Board of Trustees.  Vidaillet's letter emphasized that:

"It is important to know if the actions of those involved may have violated any laws; if the event and circumstances need to be reported to the State or the university authorities in Madison or Eau Claire; and whether Clinic employees may have violated Marshfield Clinic policies.  It would be of particular concern if senior Marshfield Clinic officials participated in or had knowledge of this deception and chose not to disclose it ….

MCRF does not feel it has the authority to investigate this matter any further. Dr. Wesbrook and I believe, however, that Marshfield Clinic has a responsibility to conduct a vigorous and thorough investigation to determine whether this matter represents an instance of fraud, waste, and other abuse of State money."

117.    Ulrich's response to Vidaillet's statement was on the next day to remove Wesbrook from the Clinic's Technology Transfer Advisory Committee, a move clearly intended to restrict Wesbrook's access to additional information or evidence of the potential fraud.

118.    Kuhl's response was to remove Van Den Heuvel from the internal compliance investigation and take it over herself.

119.    Kuhl's subsequent report acknowledged the facts that had already been uncovered by Wesbrook and Van Den Heuvel, blamed the events on miscommunication and misunderstanding of the State program, and failed to address the question of the involvement of Clinic leadership.  It also ignored the key questions of whether the events and the Clinic's role in them should be reported to State authorities and whether the Clinic should provide restitution to the State.  The report also failed to disclose that Ulrich had been a strong supporter of Caldwell's proposal to create McDel and the extent of Ulrich's knowledge of the actions of Caldwell and of the Clinic's technology transfer agent.

120.    The report also failed to acknowledge that Caldwell, Ulrich, and the Clinic Technology Transfer Office had agreed, as a condition of gaining the support of the Clinic leadership, that McDel would transfer to Marshfield Clinic the commercial rights of any discoveries or other intellectual property that resulted from the State's financial support.  Thus Marshfield Clinic may have misrepresented itself to the State as having provided matching funds to WiSCAP, while making itself the primary beneficiary of State funds that the Legislature had intended to benefit small start-up technology companies.

121.    On October 31, 2011, the Clinic Audit and Compliance Committee overturned the decision of the Research Conflict of Interest Committee and ordered it to find a way to manage the recognized conflict of interest.

122.    Never before had a Clinic corporate committee reversed a Research Foundation standing committee that was responsible for scientific integrity and ethics. One Research Conflict of Interest Committee member, Dr. Sherief Rezkalla, who was the holder of the Distinguished Physician Endowment in Cardiology Research and was also the Treasurer of the Research Foundation Board of Trustees, resigned immediately in protest.

123.    The Research Foundation Board of Trustees, recognizing that these issues affected the reputation of the Research Foundation and the Trustees' fiduciary responsibility, addressed them at its November 17, 2011 meeting.  The Trustees expressed their concern with the process through which McDel had secured the

funding and the actions of a corporate committee whose members did not do medical

research overturning the decision of seasoned physician-investigators and scientists.

124.    The Trustees passed a resolution directing Research Foundation

Administration to refuse to accept any of the State funding or any other money to do

research connected to McDel.  This was the first such resolution in the history of the

Research Foundation.

### BELONGIA AND LEE EXPAND THEIR INVOLVEMENT IN TRYING TO GET WESBROOK FIRED

125.    On November 30, 2011, Belongia expanded his involvement with Ulrich's

attempt to terminate Wesbrook's employment.  On that date Belongia sent a letter to

Ulrich, which consisted of a collection of allegations that Lee and he had made in July

2011 and found to be not true by the Research Foundation Board of Trustees in August;

restatements of allegations made by Ulrich in April 2010 against Vidaillet and

Wesbrook that had been rejected by both the Board of Trustees and the Clinic Board in

September 2010; and, Belongia's views about how he would run MCRF if he were its

Director.  A true and correct copy of Belongia's November 31 letter is attached as

Exhibit "A."

126.    On information and belief, Lee assisted in the preparation of a false letter,

prepared by Laird, which was published by Belongia and Ulrich shortly thereafter,

falsely stating that forty other individuals had complained that Wesbrook was

responsible for the problems at the Research Center.   A true and correct copy of Laird's

letter is attached as Exhibit 2.  Both Exhibit 1 and Exhibit 2 include false and defamatory statements about Wesbrook including, but not limited to, the following:

- Other scientists had filed complaints against Wesbrook with Human Resources;

- Scientists feared retaliation from Wesbrook for coming forward with similar complaints;

- Wesbrook would be the cause of resignations of highly skilled scientists, resulting in the destruction of "years of scientific program development;"

- "Wesbrook has used coercion and intimidation in his interactions with scientists and administrators" who disagree with him;

- "Wesbrook has used coercion and intimidation in his interactions with scientists and administrators" who question his decisions.

127.    MCRF Director Vidaillet responded in writing to the Belongia-Lee allegations with an email on December 19 and an attached 13-page analysis of each allegation.  He identified 17 false, misleading and, in some cases, defamatory statements, including those referenced in the preceding paragraph.  A true and correct copy of Vidaillet's response is attached as Exhibit 3.

128.    In his email, Vidaillet cited 17 instances where the Belongia-Lee letter contains false content and wrote, in part:

> "Dr. Belongia's letter is a fitting companion to the slanderous and outrageous charges made by Dr. Michael Caldwell and by Dr. Ray Haselby earlier this year.  This BOD should have never tolerated these attempts at the character assassination of Dr. Wesbrook and me in which the Clinic President has played an active role.  If other physicians had made similarly false statements with the intent to damage the reputation

36

of anyone other than people who were perceived by Dr. Ulrich as leading the opposition to governance change, those physicians would have been disciplined."

129.     Belongia subsequently self-initiated individual meetings with Members of the Clinic Board of Directors.  During those meetings, Belongia communicated that his intent was to have Wesbrook removed as Research Foundation Deputy Director.

130.     Lee likewise conveyed to a number of Clinic and Research Foundation employees her intent to get Wesbrook removed from his job.  During this same time period, Lee called Dr. Dean Emanuel, Dr. George Magnin, and other retired physicians who had once conducted research at Research Foundation's National Farm Medicine Center and conveyed false and defamatory information to them about Wesbrook.

131.     Lee urged them to contact Ulrich, members of the Board of Directors, and others who were not employees at the Clinic but had influence on its leadership.  On information and belief, the result of Lee's efforts was a letter written by former Congressman and Defense Secretary Melvin R. Laird ("Laird"), a copy of which is attached as Exhibit 2 and, as alleged before, contains false information which Ulrich subsequently used with great effect against Wesbrook.

### ULRICH'S FINAL TWO DRIVES TO CHANGE THE CLINIC'S GOVERNANCE STRUCTURE AND WESBROOK'S ACTIVITIES IN SUPPORT OF HIS SUPERVISOR'S OPPOSITION TO THAT CHANGE

132.     To prepare a third governance change proposal to present to Shareholders, Ulrich established a new governance committee made up of all members of the Board of Directors.  The so-called Governance Committee of the Whole (GCOW) met throughout 2011, although its Members were under a "gag order" that restricted

information to and informed discussion among Shareholders until six weeks before the scheduled vote on September 27.

133.    Vidaillet, in compliance with his obligations under Wis. Stat. §180 and §181, strongly opposed the restructuring plan and directed Wesbrook to assist him in research and materials preparation to use in campaigning against the plan, which he believed would damage the Clinic, its shareholders, and its community.

134.    Vidaillet wrote three letters to Shareholders: "Common Sense," September 2, 2011; "Full Disclosure," September 21, 2011; and "Final Thoughts," September 26, 2011.  In these Vidaillet sought to cause Ulrich and other supporters of the latest governance change proposal to be forthcoming and honest with the Shareholders about the true intentions and the implications of changing governance.  He also sought to ensure that  Shareholders were given information to which they were entitled by law before they made a decision to irrevocably give up their Shareholder status and disenfranchise themselves, which include among other crucial information:

- The Clinic's executive leadership was far into negotiations to irrevocably transfer control after the governance proposal was approved of Marshfield Clinic's physicians, staff, and real and administrative assets to a third-party medical management company, leaving Marshfield Clinic a hollow shell that technically retained ownership but without authority or control of healthcare.

- The Clinic President, other Officers, and General Counsel had deliberately withheld from Directors/Shareholders in March 2008 their knowledge and conclusions that the acquisition of Lakeview Hospital in Rice Lake, WI, could put the Clinic's 501(c)(3) tax exempt status in jeopardy.

- The Clinic President, other Officers, and General Counsel had deliberately withheld from Directors and Shareholders at this time their intention to use the risk of having tax exemption revoked as a primary

reason for changing Clinic governance structure, despite having already begun in December 2007 developing through a secret committee their proposal to change governance.

- The Clinic President, other Officers, and General Counsel had deliberately withheld from Directors and Shareholders crucial information that contradicted their assertion that the Clinic was no longer in compliance with IRS regulations governing tax exemption.  Among the most egregious examples was withholding information that a senior IRS official in response to a question from the Clinic's external counsel stated that the Clinic did not have to change its governance structure and could continue with an all-physician Board so long as it had "an outside independent compensation committee and a good track record of charity care."

135.    Vidaillet in his correspondence unsuccessfully attempted to cause the Clinic executive leadership to secure a formal legal opinion advising whether Clinic Shareholders needed to change Clinic governance in order to be in compliance with IRS requirements, and that this independent legal opinion come from a  law firm not already engaged by the Clinic executive leadership to advise it on how to change governance.

136.    Vidaillet also objected to the fact that Shareholders were not allowed to have an independent attorney represent their interests regarding proposed changes to physician contracts, given that General Counsel Kuhl and her staff were representing the interests of the corporate leadership and the two interests were not necessarily congruent.

137.    On September 27, 2011 Shareholders defeated for the third time Ulrich's and the Board's governance restructuring proposal.  Ulrich and Martin were aware that Vidaillet had sought and received Wesbrook's assistance in gathering accurate information, conducting analysis, and preparing correspondence.

138.    The fourth attempt to have the governance change proposal approved by Shareholders began on October 25th, when Ulrich brought to the Board of Directors a proposal to go to the bond market at an unspecified future date, which the Board passed.

139.    Ulrich failed, however, to disclose to Directors or Shareholders his intent to create a link between the bonding process and governance change that would force a fourth vote on governance restructuring before the January elections of new Officers and Directors.  When directly questioned in late November by a Shareholder, Dr. Kent Ray, Ulrich confirmed that this had been his intent.

140.    Ulrich immediately launched a campaign to convince Shareholders to vote for the governance restructuring plan by freezing $100 million in capital expenditures and blaming the freeze on the failure of Shareholders to pass the last governance change proposal.

141.    Thereafter, Ulrich and Martin communicated to Shareholders the message that unless Shareholders passed their governance proposal, Marshfield Clinic would be unable to go to borrow money through the bond market, and the failure to borrow this money would have a major negative effect on the Clinic and on their individual medical practices.

142.    Ulrich and Martin did this despite the fact that the Clinic's tax consultant T.J. Sullivan, who was a strong proponent of governance change, wrote that he would reaffirm the Clinic's 501(c)(3) status if Shareholders passed a resolution pledging to comply with any IRS directives that may result from an IRS audit.

143.     Vidaillet believed that the so-called "bonding crisis" was a ploy to coerce the shareholders into approving the reorganization plan that was not in the Shareholders best interests and believed that his duty as a member of the Board of Directors in compliance with Wis. Stats. §180 and §181 required him to expose the ploy for what it was, determine the facts and keep Shareholders informed, and oppose the attempt to ram through a permanent and irreversible governance proposal on a contrived timeline and under duress.

144.     In late October, Vidaillet asked Wesbrook assist him in analyzing this situation and formulating a response.  Two other Members of the Board of Directors, Khan an Brucker, who shared Vidaillet's concerns that Ulrich and Martin were misleading Shareholders and creating a new artificial "burning platform" to frighten and intimidate physicians into giving up their Shareholder status, also asked Wesbrook for advice and assistance.

145.     Individually and collectively, Vidaillet, Khan, and Brucker were also concerned that Ulrich and Martin, with support from Kuhl, were unduly pressuring Ziegler, a Chicago-based specialty bank which anticipated handing the next bond issue for the Clinic, and KPMG, the Clinic's external auditors, to support their views or risk losing the Clinic's business.  Vidaillet, Khan, and Brucker also suspected that the positions of Ziegler and KPMG were being misrepresented by Ulrich, Martin, and Kuhl.

146.     Consequently, on November 10, 2011 Khan sent the following  message to Ulrich:

"As a Member of the Board of Directors (BOD), I am very concerned about the information which was provided by Dr. Ronald Martin and Ms. Barbara Kuhl on Tuesday November 8, 2011 BOD meeting.  Specifically, I am referring to the unsigned document containing two paragraphs given to us by Dr. Martin and Ms. Kuhl said to summarize the substance of a meeting of the Audit and Compliance Committee of the BOD had with someone from KPMG on November 7th, 2011.

Before the BOD begins any discussions about actions that may need to be taken, the full Board needs to establish exactly what may or may not have occurred at said November 7th meeting. Therefore, I request that you direct the Audit and Compliance Committee of the Board of Directors to provide all Board members at least 3 days in advance of the next BOD meeting detailed minutes and/or notes of the meeting and all documents and correspondence the members of this Committee had received from anyone or provided to anyone before, during or after the meeting including KPMG officials.  I would also like to review KPMG's official rendering/opinion in the form of a cover letter regarding their reservations as mentioned by Dr. Martin which relates to our tax exempt status …."

147.     After Ulrich denied Khan's request, Vidaillet asked for Wesbrook's assistance in following-up on Khan's request for access to vital information, in the belief that Clinic corporate executive leadership could not deny Members of a Board of Directors such information.   On November 13, 2011, Vidaillet sent the following motion forward to the full Board:

   "**Resolution regarding direct and unfettered access to requested information related to bond financing, external auditor (KPMG) and related matters**

Clinic leadership will direct the General Counsel, the Chief Finance Officer, and the Audit and Compliance Committee of the Board of Directors and to anyone else it feels is appropriate to make available to any Board of Directors member who so desires the following documentation well in advance of the next meeting of the BOD:

   - All letters, documents, committee meeting minutes, notes, correspondence, email messages and any other pertinent materials that exist between and among the General Counsel and other members of her office, the CFO and other members of his office, Clinic officials and other members of their staff, all members of the Audit and Compliance Committee of the Board of Directors, T.J. Sullivan and his firm, and the KPMG auditors for the past 90 days.

42

- All future letters, documents, notes, etc. exchanged between and among the above people and offices from now until after the January elections.

Clinic leadership will further instruct the General Counsel, the CFO and the Chair and the other members of the Audit and Compliance Committee of the Board of Directors, and their respective staff not to delete any related emails or destroy any relevant documents.

The BOD authorizes that a team appointed through any reasonable unbiased mechanism, including at least one individual each from Legal Services, Clinic Accounting, and support staff to assist BOD members who desire in the review of the above material. "

148.    On information and belief, Ulrich mustered a majority of the Board to vote against Vidaillet's motion based on the rationale that the Board trusted Martin and the Audit and Compliance Committee.

149.    In a December 3, 2011 email to all Shareholders entitled "The Sky Is Not Falling," Vidaillet made a final effort to describe the chronology of the bonding deception; to document the actions of Clinic President Ulrich and Audit and Compliance Committee Chair Martin to create and then to deliberately avoid finding a solution to the supposed crisis; and to warn Shareholders that Clinic Officers were deliberately withholding from Shareholders significant and potentially vital information about the corporation's future and its financial prospects.

150.    Ulrich and Martin were  aware of Wesbrook's assistance to Vidaillet, Khan, and Brucker in meeting their fiduciary duties as Directors in these matters, in part because Ulrich and Kuhl were monitoring all of Vidaillet's email correspondence and all of Wesbrook's email correspondence.

151.     Ulrich and Martin's efforts to convince the Board of Directors to fire Wesbrook using false information accelerated and intensified during this time period to prevent him from assisting Vidaillet, Khan, and Brucker in their efforts to investigate or report their suspicions of fraud against Shareholders.

### ULRICH, MARTIN, BELONGIA, AND LEE ARE FINALLY SUCCESSFUL IN CAUSING WESBROOK'S EMPLOYMENT WITH MARSHFIELD CLINIC TO BE TERMINATED

152.     On December 8, 2011, Ulrich's governance change proposal passed on the fourth try.

153.     However, Ulrich suffered a personal defeat that would deny him, among other benefits, hundreds of thousands of dollars a year of income because as a result of the failure of the three previous governance restructuring proposals, the GCOW removed those provisions contained in the 2008, 2009, and September 2011 proposals that would have allowed Ulrich to stay in power indefinitely.

154.     On December 9, Ulrich summoned Wesbrook to Ulrich's office and told Wesbrook that unless he resigned and signed a "Hold Harmless" agreement by noon on Monday, December 12, Ulrich would terminate Wesbrook's employment.

155.     On December 12 in a one paragraph letter, Ulrich placed Wesbrook on administrative leave without explanation or cause until January 2, 2012, and banned him from all Clinic facilities except for medical care.  Ulrich personally came to Wesbrook's office to deliver the letter and with the intent of escorting Wesbrook out of the building in front of Research Foundation staff.

44

156.    On December 13, 2011, Ulrich informed the Research Foundation Board of Trustees Chair Nook and Vice Chair Boero of the actions he had taken against Wesbrook.  However, Ulrich did not given them any reason, ask for their views, or allow them to attend the December 20 Board meeting.

157.    On December 13, 2011, Ulrich also sent to all Members of the Board two documents that contained extensive false and misleading information, one being Belongia's November 30, 2011 letter, which is attached hereto as Exhibit 1.  The second was the letter from Laird, which is attached hereto as Exhibit 3.

158.    The Laird letter, which was originally sent to Vidaillet with a copy to Ulrich, stated in part:

Dear Humberto –

As your friend, supporter, and admirer, I was shocked when you told me two weeks ago that you might be without a job and fired within a week! As Marshfield Clinic research Chief, I immediately began an inquiry into what could cause you to make such a statement to me!

In the following two weeks, I contacted over forty individuals, Present and Past researchers, Present and Past Doctor Members of the Marshfield Clinic board, and several individuals I have gotten to know from my almost 90 year association with the Clinic ….

The Problem is not you Humberto, but your deputy director and administrative assistant at the research center.  This ran through all of my interviews.  I found not one person who wanted you fired!!

159.    On information and belief, the information in Laird's letter came from Lee.

160.    The Laird letter contained inaccuracies:  Laird was not the "Marshfield Clinic research Chief," and was not even employed by Marshfield Clinic; as he is over 90 years old and in poor health, it is highly improbable that he contacted "over forty

45

individuals"; and Vidaillet had just survived an October 25 an attempt by Ulrich and Martin to have him dismissed as MCRF Director, it is highly improbably that of 40 people Laird "found not one person who wanted [Vidaillet] fired." Given Laird's iconic status in the community, the effect was as Ulrich intended: devastating for Wesbrook and his reputation.

161.   On information and belief, the information in Laird's letter came from Lee through the retired physicians she had contacted and from Ulrich, who communicated false and defamatory information, similar in nature to the information that Belongia wrote in his November 30 memorandum, both directly and through people he had encouraged to call or write Laird. *See* ¶¶ 124-126, above.

162.   Ulrich placed the issue of Wesbrook's termination on the agenda for the Board of Directors meeting on December 20 and called each Board Member except Vidaillet and Brucker to seek his or her support in terminating Wesbrook's employment.

163.   On information and belief, in the process Ulrich communicated false, misleading, and defamatory information to the Board of Directors about Wesbrook, including but not limited to: (1) restatements of his previous allegations of a climate of fear and intimidation in the Research Foundation, attributed to Wesbrook, that was driving out highly qualified scientists; (2) restatement of his previous allegations of administrative and leadership failures by Wesbrook resulting in poor overall performance of the research program; (3) that Ulrich had to act now based on new information he had received, specifically the Belongia and Laird letters; (4) that the

46

"MCRF issue" was taking up too much of the Board's time and energy and would continue to do so if Wesbrook were not fired; and (5) Wesbrook failed to comply with the Performance Improvement Plan.

164.    On information and belief, Martin also spoke to a number of Board Members before the meeting conveying similar false and defamatory information and encouraging them to support Ulrich's request to have Wesbrook fired.

165.    Finally, while Wesbrook was in fact cooperating with the process, he had never been placed under a Performance Improvement Plan (PIP), as the term is commonly defined in human resources management, employment law, and Marshfield Clinic's own policies, nor was he given any opportunity to comply with a PIP.   At the September 6, 2011 Marshfield Clinic Board of Directors Meeting, the Board, however, approved the following motion:  "Performance improvement plan for Steve Wesbrook with Drs. Vidaillet and Ulrich formulating plan and bringing back to the Board." Wesbrook's placement on a performance improvement plan, either a formal PIP or a plan to improve performance, was conditional upon two things: (1) that Ulrich and Vidaillet agree on a plan, and (2) their agreed plan be brought back to the BOD, presumably for approval.  As neither condition was ever met, Wesbrook was never on a performance improvement plan.

166.    On December 8, 2011 Human Resources Director Keef and his deputy recommended to Ulrich that Wesbrook not be fired based on Ulrich's assessment of non-compliance, but that he be given more time in accordance with Clinic policies.  On

December 9 they drafted a letter for Ulrich advising Wesbrook of this, which he refused to sign.

167.    On December 19, 2011, the day before the Board of Directors meeting, Ulrich provided the Board Members other documents containing false and deliberately misleading information.  One was a December 15, 2011 letter from Belongia to Ulrich in which Belongia states:  "By February we expect to receive a $15 million contract …" from a pharmaceutical company with Belongia as Principal Investigator.  Belongia then threatens to resign from Marshfield Clinic "if the current MCRF leadership remains unchanged," thus causing the Clinic to lose this large contract.   The statement was false as research contracts are not granted to individual investigators but to institutions, and the Research Foundation had not received any such communication.  The contract, if it ever existed, was never awarded.

168.    Another damaging document with extensive false and misleading information was written by Ulrich himself on December 19, 2011, as a "Memo to File" entitled "Chronology of MCRF Administrative Concerns" which, on information and belief, Ulrich prepared with Martin's assistance and which are attached as Exhibit 4.  That nine-page memorandum conveys a false interpretation of events, which conflict in significant instances with well documented facts.

169.    The memorandum included at least the following false and defamatory statements:

- "A number of MCRF Scientists had left MCRF or had been forced to leave due to the actions of Dr. Steve Wesbrook;"

48

- Wesbrook had engaged in "oppressive management"

- Wesbrook had engaged in "retaliatory conduct;"

- Wesbrook's that Wesbrook did not support or understand scientific research;

- Wesbrook's management style was "retaliatory."

- Wesbrook was "out of control."

- Wesbrook's management style was "coercive."

- Wesbrook's management style was "threatening."

- Wesbrook's management style was "abusive."

- Wesbrook's management style was "contentious."

- Wesbrook "refused to meet and discuss matters" concerning the Clinic and his employment.

170.    Despite the frequent allegations by Belongia and Ulrich that many employees had filed complaints against Wesbrook for such alleged behavior, there is not a single complaint in Wesbrook's Marshfield Clinic personnel file, nor is there any record of the actions required in Marshfield Clinic's Conflict Resolution Policy that would have had to been taken in the event of such a complaint.   Vidaillet confirmed this with Human Resources Director Keefe while preparing his response to the Belongia letter, and Keefe reported the same information to Ulrich.

171.    Ulrich also misused the authority of his position as Chair of the Board of Directors to ensure that there would be no opportunity for the false and defamatory information he had provided the Board to be challenged or corrected.   Wesbrook's

written request to be informed of the specific allegations and charges against him, to be able to present evidence in his own behalf, and to appear before the Board of Directors was denied.

172.    After a cursory discussion, based on the false and defamatory information provided to the Board by Ulrich, Belongia, Martin and Lee, the Board authorized Ulrich's request that Wesbrook's employment be terminated.

## CLAIM FOR TORTIOUS INTERFERENCE WITH WESBROOK'S EMPLOYMENT WITH THE MARSHFIELD CLINIC

173.    Plaintiff realleges paragraphs 1 through 172 as if fully set forth herein.

174.    Ulrich, Martin, Belongia and Lee made the numerous false and defamatory statements about Wesbrook as described hereinbefore.

175.    The false and defamatory statements made by Ulrich, Martin, Belongia and Lee were either unprivileged or made in abuse of any privilege they may have had.

176.    Ulrich and Martin acted individually and collectively on multiple occasions from September 2011 through December 2011 to interfere with Wesbrook's contract of employment with Marshfield Clinic by attempting to and causing him to be terminated by providing individual Board Members and the Clinic Board of Directors with false and misleading information; by deliberately withholding from the Board of Directors crucial information that was relevant to the Board's decision; and by denying to Wesbrook the common rules of due process that are well defined in written Marshfield Clinic policies.

177.     Ulrich's actions were neither justified nor privileged by reasons of being outside of the scope of his official responsibilities as a Director and Officer of a not-for-profit Wisconsin corporation and were motivated by ill-will and malice toward Wesbrook and prospects of personal gain.

178.     Martin's actions were neither justified nor privileged by reasons of being outside of the scope of his official responsibilities as a Director of a Wisconsin not-for-profit corporation and were motivated by prospects of personal gain, by an intent to shield individuals with whom he had improper personal relationships who were directly involved or complicit in ethical violations and fraud, and by ill-will and malice toward Wesbrook.

179.     Belongia and Lee's actions in attempting and causing Wesbrook to be terminated by providing Ulrich, individual Board Members, and through Ulrich the full Board of Directors with false and misleading information were neither justified nor privileged.  Belongia's and Lee's actions were coordinated and conducted in collaboration with Ulrich and were motivated by ill-will and malice toward Wesbrook.

WHEREFORE, the Plaintiff, Dr. Stephen D. Wesbrook, requests judgment against the Defendants, jointly and severally:

A.      For compensatory and punitive damages;

B.      For the costs, fees and disbursements of this action; and

C.      For such other relief as the Court may deem just and proper.

Dated this 17th day of March, 2014.

STEPHEN D. WESBROOK, Ph.D.
By his attorneys,


/s/ Lester A. Pines                              .
Lester A. Pines, SBN 01016543
Attorneys for the Plaintiff
CULLEN WESTON PINES & BACH LLP
122 West Washington Avenue, Suite 900
Madison, WI 53703
Telephone: (608) 251-0101
Facsimile:  (608) 251-2883
Email: pines@cwpb.com