IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

STEPHEN D. WESBROOK, Ph.D.,

                                   Plaintiff,                         OPINION AND ORDER

          v.                                                          13-cv-494-wmc

KARL J. ULRICH, M.D., and EDWARD
A. BELONGIA, M.D.,

                                   Defendants.

Plaintiff Stephen D. Wesbrook, Ph.D., asserts claims against his former co-workers for tortious interference with his now-terminated, at-will employment contract with the Marshfield Clinic. After two rounds of motions to dismiss, defendants Karl J. Ulrich, M.D., and Edward A. Belongia, M.D., now seek summary judgment on the basis that no reasonable jury could find that: (1) defendants' alleged defamatory statements were not true; and (2) Wesbrook's termination did not benefit his employer. (Defs.' Mot. (dkt. #43).) Giving plaintiff the benefit of every inference from the undisputed facts, the record on summary judgment certainly paints a picture of a long-standing, internecine conflict over various issues by management within the Marshfield Clinic and its Research Foundation arm. Even so, plaintiff has failed to advance any evidence that defendants' statements to the Clinic's Board of Directors shortly before it terminated Wesbrook were in fact defamatory, and, therefore, the court will grant defendants' motion for summary judgment.

UNDISPUTED FACTS[1]

**A. Overview of the Parties and Other Key Individuals**

Plaintiff Stephen D. Wesbrook, Ph.D., is a 1970 graduate of the United States Military Academy at West Point, and had a distinguished career in the United States Army before joining Marshfield Clinic.[2]  Wesbrook initially worked for the Marshfield Clinic Research Foundation ("MCRF") from 2000 to 2005.  After a short stint working at a federally-funded research and development center on a project concerning IEDs, Wesbrook was rehired in November 2006 as MCRF's Deputy Director.  He held that position until January 2, 2012, when MCRF terminated his employment.

At all times material to this lawsuit, defendant Karl J. Ulrich, M.D., was a Shareholder, Member of the Board of Directors, and President/C.E.O. of the Marshfield Clinic.  During the same timeframe, defendant Edward A. Belongia, M.D., was employed as a Senior Research Scientist and the Director of the Epidemiology Research Center at MCRF.[3]

Marshfield Clinic is a corporation organized under the laws of the State of Wisconsin and recognized as a tax-exempt charitable organization under section

---

[1] The following facts drawn from the parties' submissions are material and are undisputed unless otherwise noted.

[2] Plaintiff proposes numerous facts about his background -- particularly with respect to his fidelity throughout his professional career, including while working at the Clinic, to West Point's Honor Code ("A Cadet shall not lie, cheat, steal or tolerate those who do.") -- presumably to lend credibility to his statements.  Because the court is required to resolve all disputed facts and reasonable inferences, including issues of credibility, in his favor at summary judgment, the court sees no reason to recount those facts further.

[3] As the court already found, all of the requirements of diversity jurisdiction were previously established in this case.  (3/3/14 Op. & Order (dkt. #25) 5 n.1.)

501(c)(3) of the Internal Revenue Code.  The Clinic is governed by a Board of Directors, over which Ulrich presided.[4]  MCRF is an unincorporated division of the Clinic, engaged in medical research.  Dr. Humberto Vidaillet was the Director of MCRF and Wesbrook's direct supervisor.  Beginning in 2009, Vidaillet was also a member of the Clinic's Board of Directors.

Distinct from Marshfield Clinic's Board of Directors, MCRF also had its own Board of Trustees.  Although legally employed by the Clinic, Wesbrook worked under the authority of the Board of Trustees and his duties required him to be responsive to the Board of Trustees, its Executive Committee and its Chair.  The Board of Trustees is comprised of ten public members, nine elected physicians employed by Marshfield Clinic and one elected MCRF senior scientist.  The Clinic President (Ulrich during the time relevant to this lawsuit) was one of those nine physicians.  MCRF's Board of Trustees reported directly to the Clinic Board of Directors.  Melvin Laird is a former congressman, who is involved with the Clinic and MCRF in various capacities, regularly speaks with stakeholders at the Clinic generally and at MCRF specifically.

## B.  Wesbrook's Responsibilities and Performance Evaluations

In his capacity of Deputy Director, Wesbrook assisted MCRF Director Vidaillet in a full range of responsibility for the Clinic's nationally-recognized medical research program.  He also assisted the Director in his capacity as a member of the Clinic's Board

---

[4] Wesbrook describes changes to the Board's organization and structure in late 2008 and 2009. The court also finds these proposed findings immaterial to consideration of defendants' motion for summary judgment and so does not recount them here.

of Directors.   During his approximate ten years of employment, Wesbrook received exemplary annual performance reviews from three different MCRF Directors.   Wesbrook also received 360-degree assessments by up to 25 scientists, physicians and staff with whom he worked closely.   In his 2006 and 2008 assessments, Wesbrook's highest average scores were for representing the Clinic (6.41 on scale of 1 to 7), integrity (6.33) and treating people with respect (6.13).   Both MCRF's Board of Trustees and its Director Vidaillet advised Ulrich on multiple occasions that Wesbrook's performance was exceptional and that he was an important factor in the success of MCRF.

Plaintiff also contends that MCRF was successfully managed during his tenure.   In particular, Wesbrook points to his effective management of communications, including at regular meetings with the MCRF Director, as well as how decisions were made.

### C. Plaintiff Wesbrook's Opposition to Defendant Ulrich's Governance Proposals[5]

Between May 2008 and September 2011, Ulrich attempted to reduce the independence of MCRF's Board of Trustees, as well as its oversight of MCRF's $30 million in endowments and other funds transferred from the Trustees to the Clinic's corporate executive leadership.   At the direction of MCRF Director Vidaillet and the two prior Chairs of its Board of Trustees, Wesbrook organized opposition to these attempts,

---

[5] While Wesbrook does not dispute most of defendants' account of the events leading up to his termination, he contends that Ulrich was influenced by Wesbrook's opposition to certain of Ulrich's proposed changes in MCRF's governance in recommending that the Board terminate his employment.   For the reasons stated in the opinion below, these facts are essentially immaterial to defendants' motion.   Indeed, the court will infer for purposes of summary judgment that Ulrich was motivated to remove Wesbrook, at least in part, for purely selfish reasons.   The court will nonetheless briefly set forth those proposed facts below, if only for context.

including speaking directly with Ulrich about legal concerns with respect to transferring governance of donated funds and writing a paper about how the transfer of the oversight of such funds from the Trustees may implicate their fiduciary responsibilities.

Also in 2008 (and perhaps related to his efforts to reduce the Trustee's independence -- it is not entirely clear from Wesbrook's proposed facts), Ulrich proposed that the "Clinic's physician-led, democratically-modeled governance structure [be changed] to that of more of a typical corporation." (Pl.'s PFOFs (dkt. #84) ¶ 68.) Under this model, physicians would give up their status as Shareholders and become Class A employees. Vidaillet opposed this change as well and emerged as one of the leaders of what was called the "pro-democracy opposition." (*Id.* at ¶ 76.) Vidaillet directed Wesbrook to assist him with research and materials to use in campaigning against this plan.

The plan failed to pass in July 2008 and again in June 2009. On September 27, 2011, Ulrich's governance restructuring program was defeated for a third time. Plaintiff contends that Ulrich was aware of Wesbrook's assistance in gathering information, conducting analysis and preparing correspondence in opposition to these plans.

On October 25, 2011, Ulrich brought to the Clinic's Board of Directors a fourth proposal for reorganization, this one involving the bond market. Vidaillet again asked Wesbrook to assist him in analyzing the situation and formulating a response. Once again, plaintiff contends that Ulrich was aware of Wesbrook's involvement in opposing

his proposal.   On December 8, 2011, just twelve days before the Board voted to terminate Wesbrook's employment, Ulrich's governance proposal passed.[6]

### D. Complaints about Wesbrook's Management Style[7]

#### i.    Concerns during Application and Interview Process

When Wesbrook applied for the Deputy Director position in 2006, some employees raised concerns about Wesbrook's management style.   Specifically, an unidentified member of the interview team wrote at the time that he or she "would be reluctant to hire someone who has so clearly and dramatically polarized the basic scientists that constitute the 'core' of the research organization."   (Defs.' PFOFs. (dkt. #45) ¶ 16.)   Another member of the interview team also wrote "[w]hat causes tension is

---

[6] To further inform Ulrich's personal motive or intent in seeking Wesbrook's termination, Wesbrook points to two other events.   First, Wesbrook points to the fact that in 2010 Vidaillet ran against Ulrich for Clinic President.   While this fact further underscores the contentious relationship between Ulrich and Vidaillet (and by extension, Wesbrook), it does not further Wesbrook's claim, especially because Ulrich's intent or motive does not come into play if the alleged defamatory statements are true for reasons explained in the court's opinion below. Second, Wesbrook also points to his role in August 2011 of recommending that the Board conduct an investigation into payments for consulting services received by a Marshfield Clinic physician to determine whether those payments implicate the Stark Law, 42 U.S.C. § 1395nn. Here, too, Wesbrook fails to tie this event to any alleged motive on the part of Ulrich to seek his termination.   Specifically, Wesbrook fails to point to evidence that Ulrich opposed the investigation.   And, even if he did, for reasons explained below, his intent or motive is not material given the facts at issue in this case.

[7] As with evidence of plaintiff Wesbrook's opposition to defendant Ulrich's governance proposals, these past complaints about Wesbrook have limited relevance for summary judgment, particularly as it concerns complaints *before* he was hired as MCRF's Deputy Trustee.   Indeed, plaintiff argues that *any* complaints presented to the Clinic's Board before its decision to reinstate Wesbrook's employ at its September 7, 2010, meeting could not have formed the basis for the Board's decision to terminate his employment in December 2011.   The court disagrees.   Not only does this information provide context, but much of it was summarized in Ulrich's Chronology and Belongia's letter for consideration by the Board.

when people feel they are in a rigid environment where the flow of information is controlled, and I think that has been the feeling here."  (*Id.* at ¶ 17.)[8]

Despite these concerns, as plaintiff points out, only one member of the interview committee said that she "would not employ" Wesbrook; three indicated they "would definitely" employ him, including defendant Belongia; one said she "would likely employ;" and four said they "might employ."  (Pl.'s PFOFs (dkt. #84) ¶ 26.)  In addition, physician Russell Wilke wrote a letter stating that he would resign if Wesbrook were hired for the role, and he did indeed resign shortly after Wesbrook became Deputy Director.   The record demonstrates, therefore, that going into his role as Deputy Director, there were at least a mixed views of Wesbrook and his management style.

### ii.    Concerns Raised between 2006 and September 2010

From time to time over the next five years, Clinic and MCRF employees, retired physicians and others also complained to Ulrich and Human Resources about Wesbrook's management style.  For example, Dr. Joe Mazza is a physician at the Clinic involved in research at MCRF.  Based on his observations and discussions with other employees, Mazza believed that the environment of MCRF had changed significantly since Wesbrook became Deputy Director, and specifically had become a very unpleasant place to work.   Mazza also believed that Wesbrook discouraged scientists and

---

[8] In addition to these undisputed, contemporaneous documents, defendants also submit the declaration of employee Jordan Ott, who averred that she opposed Wesbrook's candidacy at the time.

administrators from expressing viewpoints that were contrary to his own.   Mazza discussed these concerns with Ulrich.

Similarly, Dr. Donald Dart is a retired physician who worked at the Clinic from 1973 to 2007 and is currently an Emeritus Research Clinician at MCRF.  Based on his observations and conversations with others, Dart believed that Wesbrook was having a negative impact on morale, and that many employees found Wesbrook to be intimidating and demeaning and feared retribution if they said anything contrary to Wesbrook's views.  Dart, too, shared these concerns at the time with Ulrich.

In March 2010, Dr. Mark Borchardt also reported to HR that Wesbrook and Vidaillet had made derogatory comments about MCRF scientists and that a number of scientists had left or had been forced to leave MCRF due to Wesbrook's and Vidaillet's actions.  Around that same time, Dr. Michael Caldwell sent an email to MCRF's Board of Trustees identifying the names of 15 scientists that had left MCRF since 2006.

In addition, around August 2010, Dr. Sanjay Shukla, who has been employed as a research scientist at MCRF since 1998, participated in a meeting with Wesbrook and found his conduct demeaning.  Marlene Stueland, a Research Center administrator, was also in attendance, and felt that Wesbrook's tone and behavior were inappropriate, analogizing Wesbrook's treatment of Shukla to being "whipped like a dog."   (Defs.' PFOFs (dkt. #45) ¶ 34 (quoting Stueland Decl. (dkt. #65) ¶ 7).)   On the advice of Stueland, Shulka met with Ulrich to report his encounter with Wesbrook.  Shukla stated that he found Wesbrook to be intimidating and vindictive, and that he found the

8

environment at MCRF was toxic under Wesbrook's management.  During this meeting with Ulrich, Shukla broke down in tears.

Finally, Dr. Catherine McCarty was a research scientist at MCRF from 2001 to 2011.  Between April and September of 2010, McCarty contacted Ulrich on several occasions to express concerns about Wesbrook's management style.  McCarty told Ulrich that she viewed Wesbrook's management style as oppressive and believed that Wesbrook retaliated against scientists who challenged his decisions.  McCarty eventually told Ulrich that she would leave if conditions did not change.[9]

### E.  Wesbrook's Initial Firing and September 2010 Reinstatement

Ulrich scheduled a meeting with Wesbrook on September 2, 2010, to discuss concerns about his management style.  Vidaillet told Wesbrook to take the remainder of that day off as vacation.  Wesbrook followed Vidaillet's advice and left work early, skipping his scheduled meeting with Ulrich.  Nevertheless, Ulrich considered Wesbrook's failure to attend the meeting as a refusal to meet and discuss matters.  Accordingly, Ulrich terminated Wesbrook's employment that same day.

Vidaillet asked the Clinic's Board of Directors to review this termination decision, and on September 7, 2010, the Board reinstated Wesbrook by a vote of 9-8.  In response to Borchardt's complaint and Caldwell's email, however, the Board passed a motion directing HR to investigate the reasons for these departures and whether there was a culture of intimidation at MCRF.

---

[9] McCarty resigned in June 2011.

### F.  Results of HR's Investigation

On September 28, 2010, Human Resources Director David Keefe presented a report based on his investigation about scientist turnover to the Clinic's Board of Directors.  Keefe spoke to nine of the 15 scientists identified in Caldwell's email.  The departed scientists asked Keefe to keep their identities anonymous and many expressed concerns about the possibility of retribution from Wesbrook.  According to Keefe, the departed scientists described Wesbrook's management style as "cold, militaristic, harsh, retaliatory, abusive, negative, confrontational, out-of-control, threatening, boot-camp like, and contentious."  (Defs.' PFOFs (dkt. #45) ¶ 47 (citing Keefe Decl. (dkt. #54) ¶¶ 7-8); Graham Decl., Ex. 6 (dkt. #48-6) 3 at ¶ 2.5).)[10]   Keefe also reported to the Board that the departed scientists felt there was a lack of respect and support for research scientists, as well as a lack of understanding of scientific research by both Vidaillet and Wesbrook.  Wesbrook conducted his own study around the same time, concluding that the attrition of scientists was due to "the consequences of setting productivity standards and holding people accountable to meet them," rather than a hostile climate.  (Pl.'s PFOFs (dkt. #84) ¶¶ 114, 125.)  MCRF's Board of Trustees endorsed Wesbrook's report and forwarded it to Ulrich for his review.

---

[10] Plaintiff objects to this proposed finding as hearsay, but the court does not consider these statements for the truth of the matter asserted.  Rather, the court only considers it as reflecting what Keefe conveyed to the Board and the accuracy of Ulrich's summary of Keefe's report in his later prepared "Chronology."  (*See* discussion, *infra,* at Opinion § II.)

### G. Further Complaints about Wesbrook in His New Role as Interim Director of BIRC

Despite Keefe's report, Wesbrook was given additional responsibilities in December 2010, being named the interim director of the Biomedical Informatics Research Center ("BIRC"), one of MCRF's five research centers.   Following this appointment, several people again complained to Ulrich about Wesbrook's management style.  For example, Dr. Peggy Peissig was a research scientist who helped establish BIRC. Peissig found Wesbrook to be controlling and intimidating, and she had trouble working with him.  During the spring and summer of 2011, Peissig contacted Ulrich on several occasions to report concerns about Wesbrook's management style.  In particular, she told Ulrich that after questioning some of Wesbrook's decision, he ignored and bypassed her. Peissig further reported that Wesbrook said her "loyalties were not in the right place." Peissig also expressed concerns about Wesbrook to Dr. Ken Letkeman, Dr. John Melski, and the Administrator of BIRC, Lori Weigel, among others.  Peissig eventually resigned her position on July 11, 2011, stating that she "made this decision because I wanted to get away from Dr. Wesbrook."  (Defs.' PFOFs (dkt. #45) ¶ 55 (quoting Peissig Decl. (dkt. #62) ¶ 9).)

On March 17, 2011, three of the administrators of the Research Centers, Jordon Ott, Lori Weigel and Marlene Stueland, also met with Keefe and reported that Wesbrook micro-managed all of the Research Centers of MCRF and refused to assist them or allow them to do their jobs.  They further reported that Wesbrook retaliated against persons who complain or disagree with him, and that their supervisors were unwilling to address the issue for fear of Wesbrook's retribution against them.

In addition, Dr. McCarty -- who had previously complained to Ulrich about Wesbrook several times during April and September of 2010 -- resigned her position on June 24, 2011.  In her exit interview, McCarty stated that she resigned due to Wesbrook's and Vidaillet's administration and hostile treatment.  McCarty gave this same reason for her departure to Belongia and Ulrich.[11]

Finally, Dr. Steven C. Waring was a research scientist at MCRF's Epidemiology Research Center, who expressed concern that:  (1) the administrative environment within MCRF had become increasingly adversarial under Wesbrook's leadership; (2) there was a significant amount of conflict, inaction, and dysfunction; and (3) some researchers found it difficult to maintain scientific productivity.  Waring communicated these concerns to Belongia.  In June 2011, Waring resigned, also due in part to his concerns about MCRF's administrative environment.[12]

## H. Board Ordered Performance Improvement Plan and Wesbrook's Eventual Termination

For all times relevant to this lawsuit, Dr. Barbara Lee was a research scientist at MCRF and was Director of the National Farm Medicine Center.  On July 15, 2011, Belongia and Lee sent a letter to Ulrich, requesting that the time commitment for the

---

[11] To others, McCarty communicated that she was leaving to care for her aging parents, but there is no dispute that this reason was not accurate.  Even if it were, there is no evidence that Belongia and Ulrich, or others McCarty communicated with during her formal exit interview, had reason to disbelieve her statements that Wesbrook's hostile treatment had contributed to her decision to resign.

[12] Although of limited relevance, if any, for purposes of this motion, there appears no dispute that complaints about BIRC's management stopped after someone else was appointed to replace Dr. Wesbrook at its Interim Director.

MCRF Director position be increased.  That letter was presented to the Clinic's Board of Directors later in the month, and the Board directed the Systems and Process Department to assess the commitment needed for the MCRF Director position.

Bob Dums conducted the subsequent assessment, contacting 13 MCRF employees.  Five of the employee contacted expressed unsolicited concerns about a hostile work environment and identified Wesbrook as a source of the problem. Specifically, employees expressed concerns that Wesbrook controlled and micro-managed the Research Centers, was hostile and retaliatory towards employees, and paid selective attention.[13]

Dums presented his report to the Board on September 6, 2011.  In that meeting, Belongia, Lee and others also testified.  The Board then passed a motion requiring Wesbrook to participate in a performance improvement plan ("PIP"), with "Vidaillet and Ulrich formulating the plan and bringing [it] back to Board."  (Defs.' Resp. to PFOFs (dkt. #94) ¶ 75 (quoting Graham Decl., Ex. 11 (dkt. #48-11) p.11).)  The motion requiring Dr. Vidaillet's involvement in the PIP was passed after he voted against the original motion.  (*Id.* at p.12.)

Following the Board ordering a PIP, Belongia and Lee reported to HR that they suspected Wesbrook and Vidaillet were retaliating against them for raising concerns

---

[13] Plaintiff does not dispute that this is what Dums reported, but objects to this proposed fact as hearsay.  Once again, the court does not consider the statement for the truth of the matter asserted, but rather as reflecting information conveyed to the Board and for purposes of assessing the accuracy of Ulrich's Chronology.  (*See supra* n.10.)

about MCRF administration.[14]  Specifically, Belongia complained that Wesbrook was not filling replacement positions, had forbidden the directors of the research centers from meeting when he was not present, and took steps to limit internal communications in other ways.  For her part, Lee reported that her annual review had been negatively impacted by low scores from Wesbrook and Vidaillet, and that Wesbrook refused to fill an approved position.

In addition, Ott again contacted Ulrich and Belongia to report frustrations with Wesbrook's management style.  In particular, Ott complained that Wesbrook devalued key employees, discredited expert evaluators, and disregarded established standards.  Ott eventually resigned from MCRF, effective November 30, 2011, and told Belongia that she was leaving her position because of Wesbrook.

Dr. Jennifer Meese, a research scientist at MCRF, spoke to Keefe about similar concerns in November 2011.  Meese stated that the working environment was very difficult and that she felt "pinched" between Wesbrook and other employees.  Meese also reported that Wesbrook used war imagery and metaphors, referring to employees with whom he disagreed as "they," "evil," and "the enemy."  Meese was herself afraid of being put in Wesbrook's "enemy" bucket.  She reported experiencing heart palpitations at work and sometimes waking up in the middle of the night crying.  Meese was concerned about retaliation and asked for assurances that her identity would not be revealed.  When leaving Keefe's office, Meese departed through another department to avoid Wesbrook

---

[14] Plaintiff does not dispute this, but points out that no formal written complaint was ever filed.

14

seeing that she met with someone in HR.   Despite her fears, Meese also spoke to Belongia about her concerns with Wesbrook.

Paula Pritzl, an Employment Manager with HR, assisted Ulrich in drafting Wesbrook's PIP.   On October 5, 2011, Vidaillet, Ulrich and Pritzl met to discuss the draft.   Vidaillet stated that he disagreed with it.   On November 10, the three met again and Vidaillet provided alternative plans.   Ulrich then asked Pritzl to incorporate any relevant sections of Vidaillet's documents into the PIP.

Despite this, plaintiff contends that a PIP never went into effect because:   (1) Ulrich and Vidaillet were required to approve it and Vidaillet never gave his approval; and (2) the PIP was never brought back to the Board for its approval as originally directed.   There is, however, no dispute that Ulrich provided the "integrated PIP" to Wesbrook, telling him that it was the only plan that would be used, and that Wesbrook then requested a meeting with Pritzl.

Pritzl documented her November 21, 2011, meeting with Wesbrook in a contemporaneous memo, which stated in pertinent part:

> At first, I thought the meeting was to discuss what he needed to do to draft a response to the PIP.  At least that is what he made it sound like when he called to set up a time to meet. . . .  I felt that Steve met with me to try and intimidate me.  I took many of his comments as a threat to my professional reputation and continued employment; and that I should remove myself from the PIP process.

(Defs.' PFOFs (dkt. #45) ¶ 117 (quoting Graham Decl., Ex. 13 (dkt. #48-13) 7).)

During a meeting with Ulrich and others on December 8, 2011, Wesbrook passed out his own memo, which Ulrich believed failed to adequately address the concerns

15

raised in the PIP.   Upon Ulrich's direction, three individuals in HR also reviewed Wesbrook's memo.   None found his memo response to be acceptable.   In particular, Pritzl, as one of the reviewers, concluded that Wesbrook's response did not reflect a good faith attempt to work with the PIP process.

On Friday, December 9, 2011, Ulrich advised Wesbrook that he could resign immediately and release the Clinic from liability in exchange for two months of severance pay, or resign without release and compensation.   If he failed to resign, Ulrich told Wesbrook that his employment would be terminated.   Ulrich gave Wesbrook until Monday to decide.

On Monday, Ulrich instead placed Wesbrook on administrative leave in order to ask the Board to support his decision to terminate Wesbrook at its scheduled December 20 meeting.   Before that meeting, Ulrich spoke to various Board members and provided them with background materials, including three new documents -- a chronology prepared by Ulrich, a letter written by Belongia and a letter written by Congressman Laird -- each of which plaintiff alleges contain one or more defamatory statements.   The Board also received a letter from soon-to-be Center Director, Dr. Matthew Kiefer, in which he expressed concerns about Wesbrook's management style and his belief that Wesbrook was responsible for the recent departures of scientists and employees from MCRF.   The Board also received a letter from Vidaillet, offering an alternative account of the PIP process, as well as various emails and documents from Wesbrook and Vidaillet.

In the end, the Board voted 13-2 in favor of termination.   As a result of which Wesbrook's employment was terminated effective January 2, 2012.

16

OPINION

**I.  Requirement of Proof of Defamatory (Untrue) Statements**

In its prior opinions denying defendants' motions to dismiss, the court set forth the necessary elements of a claim of tortious interference with an at-will employment contract when asserted against co-workers or supervisors.   Now, at the summary judgment stage, plaintiff must put forth sufficient *evidence* from which a reasonable jury could find:  (1) the plaintiff had a contract or a prospective contractual relationship with a third party; (2) the defendant interfered with that relationship; (3) the interference was intentional; (4) there was a causal connection between the interference and damages; *and* (5) the defendant was not justified or privileged to interfere.   *Briesemeister v. Lehner*, 2006 WI App 140, ¶ 48, 295 Wis. 2d 429, 720 N.W.2d 531.

Defendants' summary judgment motion is appropriately focused on this fifth element.  In *Preston v. Wisconsin Health Fund*, 397 F.3d 539 (7th Cir. 2005), the Seventh Circuit recognized that tortious interference claims brought in the context of employment raise difficult issues.   In particular, the court stressed the need to avoid converting employment at-will into employment terminable only for cause.  397 F.3d at 543 (citing Mark R. Hinkston, *Tortious Interference with At-Will Employment*, Wisconsin Lawyer, Sept. 2001, at pp.14, 16-17, 54, 56).  To do so, the court focused on the proof required to demonstrate that the defendant had an improper motive.  *Id*.  Accordingly, plaintiff puts most of his response in that basket, arguing that showing improper motive ordinarily involves weighing the factors of § 767 of the Second Restatement, a necessarily fact intensive exercise most appropriate for a trier of fact at trial.

17

However, the Seventh Circuit explained in *Preston* that for a tortious interference claim to proceed against a co-worker or supervisor, "more is required than that a discharge be tainted by some private motive, such as greed, [or] personal dislike." 397 F.3d at 544. Specifically, "[t]he plaintiff must prove *both* [1] that the employer did not benefit from the defendant's act *and* [2] that the act was independently tortious, for example as fraud or defamation." *Id*. (emphasis added). In his opposition, plaintiff essentially ignores this part of *Preston*, pointing instead to evidence that Ulrich (and perhaps Belongia, though plaintiff's theory is less clear for him) had an improper motive or intent in seeking Wesbrook's termination, or at least a reasonable factfinder could so find.

Wesbrook's evidence of internal strife within the Clinic is strong, especially as it concerns Ulrich's possible motives -- in creating his Chronology, providing it and other documents (including Belongia's and Laird's letters) to the Board before its December 2011 meeting on Wesbrook's possible termination, speaking with Board members before that meeting, or ultimately recommending Wesbrook's termination. Certainly, a reasonable jury *could* find that Ulrich (if not Belongia) did all this out of a desire to consolidate his own power base within the Clinic and its MCRF division, rather than for his employer's benefit, although defendants do a formidable job of documenting ongoing complaints about Wesbrook's rigid management style and defendants could well have believed that consolidation of power over the MCRF in the Clinic's President/CEO would ultimately benefit the Clinic. But none of this speculation is material to the *separate*

18

question of whether as his co-worker and ultimate supervisor, respectively, defendants Belongia or Ulrich committed the independent tort of defamation as plaintiff claims.

To prove defamation, plaintiff must establish that the alleged defamatory statement "(1) was spoken to someone other than the person defamed, (2) is false, (3) is unprivileged and (4) tends to harm the defamed person's reputation so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Torgerson v. Journal Sentinel, Inc.*, 210 Wis. 2d 524, 534, 563 N.W.2d 472, 477 (1997).  Therefore, to prove tortious interference under *Preston*, the plaintiff here must establish that the statements made by the defendants were untrue and unprivileged. Otherwise, courts will be led into the very quagmire of cause to terminate at-will employment contracts that *Preston* sought to avoid and plaintiff's proof plainly invites.

Even if, as plaintiff contends, that proof of some private motive alone were enough under *Preston*, Wisconsin courts have consistently stressed that "the transmission of truthful information is privileged, does not constitute improper interference with a contract, and cannot subject one to liability for tortious interference with a contract." *Mackenzie v. Miller Brewing Co.*, 2000 WI App 48, ¶ 63, 234 Wis. 2d 1, 608 N.W.2d 331 (quoting *Liebe v. City Fin. Co.*, 98 Wis. 2d 10, 13, 295 N.W.2d 16 (Ct. App. 1980)); *see also Westphal v. Smelser*, 2008 WI App 135, ¶ 28, 313 Wis. 2d 830, 756 N.W.2d 809 (unpublished) ("[T]ruthfulness is not merely another factor.  Instead, as we have recently reiterated, truth is a defense to a claim of intentional interference with contract based on an accusation of communicating false information.") (internal citations and quotation marks omitted).

With that law in mind, the sole question on summary judgment is whether plaintiff can point to evidence establishing a genuine issue of material fact as to whether defendants Ulrich or Belongia defamed him before the Board, or even more specifically untrue, unprivileged representations were made to the Board before it decided to terminate Wesbrook.

## II. Alleged Defamatory Statements

Of the myriad of statements in the three documents plaintiff identifies in opposition to defendants' motion for summary judgment -- Ulrich's Chronology, Belongia's letter, and Laird's letter (under the theory that Ulrich passed that letter onto the Board) -- he actually argues only four were defamatory.[15]   The court will consider each in turn.

### A.  Belongia Letter

On November 30, 2011, Belongia sent a letter with supporting documentation to Ulrich that identified concerns about MCRF's administration.  (Graham Decl., Ex. 16 (dkt. #48-16).) The letter is quite detailed, listing several concerns about Wesbrook, as well as describing Vidaillet's failure to address those concerns, consistent with the lengthy description described above in the Facts.  Wesbrook does not dispute the truthfulness of Belongia's letter save for the following two statements:  (1) "Steve Wesbrook has used *coercion* and intimidation in his interactions with scientists and administrators," and (2)

---

[15] Plaintiff repeats this same argument with respect to Ulrich's statements to Board members prior to the December 20, 2011, Board meeting, and his decision to pass along the Belongia letter, his Chronology, and the Laird letter.

"Several other scientists have expressed their frustration to me in private, and they are understandably concerned about retaliation if they go on the record.  Some of them have already *filed* complaints with Human Resources regarding the Deputy Director."  (*Id.* at 1-2 (emphasis added).)

As for Belongia's statement that "Steve Wesbrook has used *coercion* and intimidation" (Graham Decl., Ex. 16 (dkt. #48-16) 2 (emphasis added)), plaintiff contends that "[t]here is a substantial difference between coercion and intimidation." (Pl.'s Opp'n (dkt. #82) 10.)   Whereas being intimidated is subjective and can be unintentional, plaintiff argues that coercion "entails overt, forceful acts," relying on a dictionary definition for support.   (*Id.* (citing *Coerce*, Merriam-Webster, http://www.merriam-webster.com/dictionary/coerce ("to restrain or dominate by force," "to compel to an act or choice," or "to achieve by force or threat") (last visited July 24, 2015).)   As such, plaintiff argues that Belongia's statement is false because Belongia admitted that he did not "specifically identify episodes of coercion, rather administrative dysfunction and problems."  (*Id.* at 11.)

As defendants point out in response, however, "coercion" is not limited to acts of force; it is instead commonly interchanged with "intimidation."  *See, e.g.*, Am. Heritage Dictionary of the English Language 357 (5th ed. 2011) (defining "coerce" as "[t]o pressure, intimidate, or force (someone) into doing something"); *id.* at 918 (defining "intimidate" as "to coerce or deter with threats"); Webster's 3d New Int'l Dictionary of the English Language 439 (2002) (defining "coerce" as "[t]o restrain, control, or dominate nullifying individual will or desire (as by force, power, violence or

intimidation)"); Oxford Am. Desk Dictionary & Thesaurus 141 (3d ed. 2010) (listing "intimidate" as a synonym of coerce).  Indeed, the very dictionary cited by plaintiff also includes "to compel to an act or choice" as an alternative definition of coercion from ones requiring force.  *Coerce*, Merriam-Webster, http://www.merriam-webster.com/dictionary/coerce ("to restrain or dominate by force," "to compel to an act or choice," or "to achieve by force or threat") (last visited Dec. 2, 2015).  Indeed, in his own submissions, plaintiff tellingly uses "coerce" to describe *Ulrich's* actions, when there is no evidence that Ulrich exerted overt acts of force to persuade the Board to adopt one of his proposals.  (*See* Pl.'s PFOFs (dkt. #84) ¶ 94 ("Vidaillet believed that the so-called 'bonding crisis' was a ploy to *coerce* the shareholders . . . .") (emphasis added).)

Given that plaintiff concedes (as he must, since it is undisputed) that others complained of him being intimidating, plaintiff's attempt to create a disputed factual issue based on Belongia's use of the word "coercion" fails as a matter of law.  Even if Belongia's use of "coercion" was somehow technically flawed, his complete statement that Wesbrook used coercion and intimidation is at least "substantially true," and that is all that is required.  *See Terry v. Journal Broad. Corp.*, 2013 WI App 130, ¶ 16, 351 Wis. 2d 479, 840 N.W.2d 255 (citing *Lathan v. Journal Co.*, 30 Wis. 2d 146, 158, 140 N.W.2d 417 (1966) (It is not "necessary that the article or statement in question be true in every particular. All that is required is that the statement be substantially true.")).

Plaintiff also points to Belongia's statement that some scientists have "*filed* complaints with Human Resources regarding the Deputy Director."  (Graham Decl., Ex. 16 (dkt. #48-16) 1 (emphasis added).)  Plaintiff contends that in using the word "filing,"

22

Belongia "connotes starting a formal investigative process." (Pl.'s Opp'n (dkt. #82) 14.) Indeed, plaintiff points out Belongia conceded at his deposition that no one submitted a formal, written complaint, and acknowledged that "filed" "was probably not the optimal word to use." (*Id.*)

In response, defendants argue that Belongia did *not* say that the complaints were in writing or that the individuals complaining used the Clinic's formal problem resolution process. In other words, Belongia did not represent that the complaints constituted formal, written statements, initiating an investigative process. Instead, Belongia's use of the word "filed" covers the many complaints to HR, whether provided informally, as part of a formal review, or during exit interviews.

Here, too, the court agrees with defendants that Belongia's use of the word "filed" does not call into question the accuracy of his overarching statement that scientists were complaining to HR about Wesbrook's management style. If nothing else, Belongia's statement was again "substantially true" when considered in context. *See Terry*, 2013 WI App 130, at ¶ 16.[16]

---

[16] As previously noted, plaintiff maintains that none of the complaints brought to the Board's attention before its reinstatement of Wesbrook's employment in September of 2010 should have been relied upon by defendants in making representations to the Board in December of 2011, on the theory that all such earlier complaints would have been previously considered and rejected by the Board. On the contrary, it is perfectly reasonable to remind the Board of past problems with an at-will employee when considering whether a reoccurrence of those problems now justifies action. In any event, plaintiff is not contending the representation of the earlier complaints was untrue.

23

### B.  Ulrich Chronology

On December 19, 2011, Ulrich drafted a document entitled "Chronology of MCRF Administrative Concerns." (Graham Decl., Ex. 1 (dkt. #48-1).)  The letter is nine pages long and provides a timeline of events, documents and conversations dating back to November 2006, all of which concern undisputed events listed above in the Fact Section of the Opinion.   Plaintiff does not dispute that the information in the Chronology is accurate, except for Ulrich's statement that "Wesbrook failed to comply with the performance improvement plan," since plaintiff maintains that "no approved performance improvement plan ever existed."  (Pl.'s Resp. to Defs.' PFOFs (dkt. #83) ¶ 126.)

To be accurate, the Chronology itself does *not* state that Wesbrook "failed to comply"; rather, it states that Wesbrook's response to the PIP was "unacceptable." (Graham Decl., Ex. 1 (dkt. #48-1) 9.)  Even crediting plaintiff's assertion that Ulrich communicated -- whether verbally or in writing -- that Wesbrook failed to comply, Wesbrook's only dispute as to that statement concerns whether there was a PIP in place requiring Wesbrook's compliance.

Ulrich's statement that Wesbrook's response to the PIP was unacceptable (or even failed to "comply") must also be viewed in context.  Ulrich made clear in his Chronology that Vidaillet repeatedly opposed the PIP as Ulrich drafted it, even with the support of HR and after incorporation of Vidaillet's proposed, competing PIPs.  (Graham Decl., Ex. 1 (dkt. #48-1) 5-6.)  Ulrich also stated that after Wesbrook expressed confusion over the competing PIPs, he clarified that "there was only one PIP and that was the one that

24

[Ulrich] had provided." (*Id.* at 6.)  Moreover, Vidaillet himself submitted an email to the Board criticizing Ulrich's proposed PIP, among other complaints:

> Please recognize that Dr. Ulrich's so-called "Performance" Improvement Plan is an outrageous and obvious attempt to retaliate against me by once again attacking my Deputy Director with the intent of firing him. . . .  This plan is not meant to identify improvement opportunities.  It is designed to make sure the subject fails.

(Vidaillet Decl., Ex. 15 (dkt. #87-16) 1.)  All of this was before the Board at the time it decided to terminate Wesbrook's at-will employment in December 2011, as was Vidaillet who spoke on Wesbrook's behalf.  (Graham Decl., Ex. 18 (dkt. #48-18).)

In light of the full context provided by the Chronology, no reasonable factfinder could view Ulrich's basic statement as a representation that the Board had adopted a formal PIP to which Wesbrook refused to comply, particularly with Vidaillet's responsive email and further clarification.  *See Martin v. Outboard Marine Corp.*, 15 Wis. 2d 452, 462-63, 113 N.W.2d 135, 140 (1962) ("[I]n determining whether a communication is defamatory, the whole context of the communication should be construed with the alleged particular words of defamation if there is an integral relationship between the contents and the alleged words.").  On the contrary, in light of overwhelming evidence of dissatisfaction with Wesbrook's management style before the Board in the documents Ulrich provided, no reasonable trier of fact could view this single, inartfully crafted statement material, even if somehow untrue.

### C. Laird Letter

Finally, at some point in the fall of 2011, Vidaillet told Congressman Laird that his job as Director of MCRF was on the line.  Laird then took it upon himself to explore Vidaillet's concern.  He reported in a subsequent letter to Vidaillet, dated November 3, 2011, that he spoke with at least 40 people who had ties to the Clinic and MCRF about what was going on at MCRF and whether they wanted Vidaillet fired, including present and past researchers, physicians, and directors or other individuals.  Laird reported in this same letter that the people with whom he spoke voiced concerns about Wesbrook, not Vidaillet.[17]

Plaintiff challenges the accuracy of Laird's report, namely his account that he spoke with 40 people and that none voiced concerns about Vidaillet, especially given that Vidaillet had just survived Ulrich's effort on October 25 to have Vidaillet dismissed as MCRF Director.  Plaintiff also contends that this dispute is material because it should have caused Ulrich to question the accuracy of the information Laird provided.

In fact, Laird's statement is largely tangential to Wesbrook's claims here, except that Ulrich happened to include Laird's letter in the papers he provided to the Board before it terminated Wesbrook's employment.  In contending that Wesbrook should have known that Laird's statement was false -- either as to the number of people Laird

---

[17] Once again, this statement is not being considered for the truth of the matter asserted, but rather as to what Laird communicated in his letter to Vidaillet, which was then passed along to Ulrich and eventually to the Board.

26

interviewed *or* their failure to mention Vidaillet -- is of no real consequence.[18]  Regardless of whether the number of individuals with whom Laird spoke was inflated, or Laird was too easy on his friend Vidaillet, Wesbrook does not dispute the material content of Laird's letter -- that individuals complained about *Wesbrook's* management style.  Indeed, he cannot credibly dispute this in light of the many contemporaneous documents and subsequent declarations submitted in this case that complain about Wesbrook's management style.  At the end of the day, a reasonable factfinder could not find that Ulrich defamed *Wesbrook* by passing along Laird's letter.

Having found that plaintiff failed to raise a genuine issue of material fact in support of his assertion of defamation, the court will grant summary judgment to defendants, enter judgment in their favor, and close this case.

## ORDER

IT IS ORDERED that:

1) Defendants Karl J. Ulrich, M.D. and Edward A. Belongia, M.D.'s motion for summary judgment (dkt. #43) is GRANTED.

2) Defendants' motion for order on trial procedure (dkt. #97) is DENIED AS MOOT.

---

[18] At his deposition, Laird did not name each of the forty individuals he purportedly spoke to, although as defendants point out, it appears plaintiff's counsel did not provide him with an opportunity to complete the list beyond an initial ten names.

3) The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 3th day of December, 2015.

BY THE COURT:


/s/

_____
WILLIAM M. CONLEY
District Judge